# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY & COUNTY OF SAN FRANCISCO, CITY OF BOSTON, CITY OF CHICAGO, CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, CITY OF NEW YORK, MARTIN LUTHER KING JR. COUNTY, CITY OF PROVIDENCE, CITY OF SAN DIEGO, COUNTY OF SANTA CLARA, CITY OF SEATTLE, HOUSING AUTHORITY OF THE CITY AND COUNTY OF SAN FRANCISCO, BOSTON HOUSING AUTHORITY, HOUSING AUTHORITY OF THE CITY OF FRESNO, HOUSING AUTHORITY OF FRESNO COUNTY, HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, LOS ANGELES COUNTY DEVELOPMENT AUTHORITY, SAN DIEGO HOUSING COMMISSION, HOUSING AUTHORITY OF THE CITY OF SANTA BARBARA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development,<br><br>Defendants. | Civil Case No.: |

## COMPLAINT

## INTRODUCTION

1. For decades, Congress has ensured that federal housing assistance programs are available to families that include some members who are U.S. citizens or have eligible immigration statuses, and some members who are ineligible for financial assistance because of their immigration status ("mixed status families").[1]

2. Through Section 214 of the Housing and Community Development Act of 1980 ("Section 214"), 42 U.S.C. § 1436a, Congress requires that mixed status families receive certain federal housing financial assistance that is prorated based on the number of family members who establish that they are U.S. citizens or eligible immigrants. Family members who are not eligible because of their immigration status do not receive financial assistance, but to avoid separating families, Section 214 permits these ineligible individuals to reside with their eligible family members in a partially federally subsidized unit.

3. Defendant the United States Department of Housing and Urban Development ("HUD") has long heeded Congress's directive to protect the family unity of mixed status families by providing prorated assistance based on the number of eligible members.

4. Based on this long-settled understanding, tens of thousands of low-income mixed status families who may otherwise face homelessness are able to access financial assistance to secure stable, affordable housing. Access to stable housing is critical to the well-being and economic self-sufficiency of these mixed status families, and to the health and development of their children, the vast majority of whom are U.S. citizens or eligible immigrants.

[1] *See* 24 C.F.R. § 5.504(b) (defining mixed status families). Eligible immigration statuses include lawful permanent residents, asylees, refugees, and certain humanitarian parolees. *See* 42 U.S.C. § 1436a(a); 24 C.F.R. § 5.506(a).

5. HUD now seeks to upend this well-established statutory and regulatory scheme by effectively terminating federal housing assistance for mixed status families, disrupting the lives of thousands of Plaintiffs' residents and imposing significant costs on Plaintiffs.

6. On November 12, 2026, HUD promulgated a final rule on verifying eligibility for federal housing assistance ("Final Rule" or "Rule") that, for the first time in decades, requires every member of a household for which *any* member receives federal housing assistance to submit verification that they are U.S. citizens or have eligible immigration status.

7. The Rule also imposes new onerous and error-prone verification requirements on *all* recipients of federal housing assistance, including eligible noncitizen tenants 62 years or older who are, by statute, not required to undergo these verification requirements.

8. In addition, the Rule requires public housing authorities to notify tenants and applicants that housing authorities and owners must immediately report to the Department of Homeland Security any household members present in the United States unlawfully.

9. Defendant Secretary Scott Turner has claimed that the Rule is intended to close a "[r]oommate [l]oophole" to prevent "illegal aliens, ineligibles, and fraudsters" from "gaming the system and riding the coattails of American taxpayers."[2] But in reality, the Final Rule primarily targets families who have lawfully accessed prorated federal housing assistance in accordance with federal law.

10. The vast majority of people harmed by the Final Rule are U.S. citizens or immigrants who are eligible to receive housing assistance.

---

[2] *See* Press Release, U.S. Dep't of Hous. & Urb. Dev., *HUD Moves to Close "Mixed Status Households" Roommate Loophole Illegals, Ineligibles, and Fraudsters: Pack Your Bags* 👋 👜 ✈ , HUD No. 26-015 (Feb. 19, 2026), https://www.hud.gov/news/hud-no-26-015.

11. U.S. citizens or eligible immigrants who live with an ineligible spouse, parent, child, or other family member now face an untenable choice: either evict loved ones or forgo the prorated assistance that they qualified for so their family can remain together. This is a Hobson's choice for most families. As a result of the Final Rule, at least 15,500 mixed status families across the country—including thousands in Plaintiffs' jurisdictions—will be terminated from prorated rental assistance and likely displaced from their homes. These families will face a heightened risk of homelessness or housing instability and myriad associated adverse health and safety impacts. These profound harms will particularly be felt by tens of thousands of children with eligible status living in mixed status families.

12. Eligible tenants who lack the required documentation to establish eligibility under the Final Rule—particularly elderly residents who have not previously been required to produce documentation of their immigration status—also face a heightened risk of displacement and homelessness.

13. The Final Rule inflicts this cruelty without any countervailing benefit. In HUD's own words, "the primary effect [of the Rule] would be to assist proportionally fewer households and household members."[3] And the costly administrative burdens imposed by the Rule on housing authorities and private landlords will also reduce the quantity and quality of affordable housing units.

14. Plaintiffs are public housing authorities and localities that are directly harmed by the Final Rule. Plaintiff Housing Authorities administer federal housing assistance programs and will incur substantial and immediate administrative and financial costs in implementing the Rule,

[3] U.S. Dep't of Hous. & Urb. Dev., *Regulatory Impact Analysis: Housing and Community Development Act of 1980: Verification of Eligibility Status 17* (Sept. 30, 2025) [hereinafter RIA], https://www.regulations.gov/document/HUD-2026-0199-0006.

including enforcing the new verification requirements and terminating subsidies for families who cannot establish eligibility. They also stand to lose significant revenue under the Final Rule.

15. Plaintiff Localities provide locally funded safety net services—including shelter, health care, and other locally funded benefit programs—that will be further strained in order to meet the basic needs of individuals and families displaced from stable federally subsidized housing because of the Rule.

16. The Final Rule's disruption to local affordable housing markets will also harm Plaintiff Housing Authorities, which administer affordable housing, and Plaintiff Localities, which have invested considerable resources in supporting the development of affordable housing in their jurisdictions.

17. The Final Rule is callous, ill-conceived, and illegal. It radically departs from statutory authority, congressional intent, and prior regulations, all of which permit mixed status families to remain in federally subsidized housing and access prorated assistance. It is also arbitrary and capricious and not the product of reasoned decisionmaking, and failed to comply with required procedures.

18. Plaintiffs therefore bring suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to vacate, set aside, and enjoin the Final Rule as contrary to law, in excess of statutory authority, arbitrary and capricious, and without observance of procedures required by law.

**JURISDICTION AND VENUE**

19. This action is brought pursuant to the APA, 5 U.S.C. §§ 701–706. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, and sovereign immunity is waived pursuant to 5 U.S.C. § 702.

20. This Court has the authority to grant the requested relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

21. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and (e)(1) because Defendants are United States agencies or officers sued in their official capacities, Plaintiffs City of Boston and Boston Housing Authority are residents of this judicial district, and a substantial part of the events or omissions giving rise to this action occurred and are continuing to occur in this district.

## PARTIES

### I. Plaintiffs

#### A. Plaintiff Localities

22. Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

23. Plaintiff City of Boston ("Boston") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

24. Plaintiff City of Chicago ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

25. Plaintiff the City of Los Angeles ("LA City") is a municipal corporation and charter city organized and existing under its Charter, the California Constitution, and the laws of the State of California.

26. Plaintiff County of Los Angeles ("LA County") is a charter county and political subdivision of the State of California.

27. Plaintiff City of New York ("New York City") is a municipal corporation organized and existing under the laws of the State of New York.

28. Plaintiff Martin Luther King Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

29. Plaintiff City of Providence ("Providence") is a municipal corporation organized and existing under the laws of the State of Rhode Island.

30. Plaintiff City of San Diego ("San Diego") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

31. Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

32. Plaintiff City of Seattle ("Seattle") is a municipal corporation organized pursuant to the constitution and laws of the State of Washington.

**B. Plaintiff Housing Authorities**

33. Plaintiff Housing Authority of the City and County of San Francisco ("SFHA") is a public housing agency organized under the laws of the State of California and created by resolution of the San Francisco Board of Supervisors.

34. Plaintiff Boston Housing Authority ("BHA") is a public body politic and corporate, created and existing pursuant to Chapter 121B of the Massachusetts General Laws and Chapter 88 of the Massachusetts Acts of 1989, as amended.

35. Plaintiff Housing Authority of the City of Fresno ("HACF") is a public body corporate and politic organized and existing under the laws of the State of California and authorized to function by resolution of the City Council of the City of Fresno. Plaintiff Housing

Authority of Fresno County ("HAFC") is a public body corporate and politic organized and existing under the laws of the state of California and authorized to function by resolution of the Board of Supervisors of Fresno County. HACF and HAFC jointly operate under the name Fresno Housing and are collectively referred to herein as "Fresno Housing."

36. Plaintiff Housing Authority of the City of Los Angeles ("HACLA") is a public housing agency organized under the laws of the State of California and created by resolution of the Council of the City of Los Angeles.

37. Plaintiff Los Angeles County Development Authority ("LACDA") is a public housing authority organized under the laws of the State of California and created by resolution of the Los Angeles County Board of Supervisors.

38. Plaintiff San Diego Housing Commission ("SDHC") is a public housing commission organized under the laws of the State of California and created by resolution of the Council of the City of San Diego.

39. Plaintiff Housing Authority of the City of Santa Barbara ("HACSB") is a public housing authority organized under the laws of the State of California and created by resolution of the Council of the City of Santa Barbara.

40. In addition, the City of New York, which is a Plaintiff Locality, *see* ¶ 27, *supra*, includes the Department of Housing Preservation and Development ("NYCHPD"), which administers federal housing assistance. Although NYCHPD is a City of New York agency, for ease of reference in this Complaint, references to Plaintiff Housing Authorities include NYCHPD.

## II. Defendants

41. Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

42. Defendant Scott Turner is the Secretary of HUD, the highest-ranking official in HUD, and is responsible for the decisions of HUD. He is sued in his official capacity.

# LEGAL AND FACTUAL ALLEGATIONS

## I. Longstanding Statutory Requirements and Consistent HUD Regulations Provide Prorated Federal Housing Assistance to Mixed Status Families

43. HUD is responsible for national housing policy, affordable housing assistance, enforcing fair housing laws, and community development. As part of its congressional mandate, HUD administers and provides federal funding for housing assistance programs. Federal housing assistance programs help millions of low-income families across the United States access safe, stable, and affordable housing.

44. The primary types of federal housing assistance programs at issue in this case are public housing, housing choice vouchers ("HCVs"), and project-based rental assistance ("PBRA"). Through each of these federal housing assistance programs, qualifying low-income families typically pay up to thirty percent of their household income towards rent, and the remainder is paid for through federally funded rental assistance.

45. Public housing is housing owned and managed by local housing authorities for eligible low-income residents at affordable rents. HUD provides federal funding to housing authorities to support public housing operating and capital expenses.

46. Through the HCV program, commonly referred to as Section 8 housing, local housing authorities provide vouchers to eligible low-income families to receive federally funded

rental assistance to help pay for qualifying units rented in privately owned housing. After the family pays up to thirty percent of their household income towards rent, housing authorities pay up to the maximum approved contract rent for the eligible unit directly to the landlord, pursuant to multi-year contracts between the housing authority and the landlord. If the family moves, they can use the HCV for another eligible housing unit in the private market.

47. Housing authorities can also choose to "project-base" a portion of their HCVs, meaning that the voucher assistance is tied to specific eligible privately owned units for qualifying low-income families. These are referred to as "Project-Based Vouchers," or PBVs, and they are a component of the HCV program. After the family pays up to thirty percent of their household income towards rent, housing authorities pay up to the maximum approved contract rent for the PBV unit directly to the landlord, pursuant to multi-year contracts between the housing authority and the landlord.

48. Finally, through the PBRA program, private property owners enter into multi-year contracts directly with HUD to rent specific eligible units to qualifying families. Pursuant to these contracts, HUD agrees to provide rental assistance to the private landlord to cover the difference between the rents contributed by the tenants and the maximum approved contract rents for the units.

49. The HCV and PBRA programs rely on a robust participation by private landlords to ensure a sufficient supply of affordable units.

50. Plaintiff Housing Authorities administer federal housing assistance programs, including public housing, HCV programs, and PBV units.

51. Section 214, codified at 42 U.S.C. § 1436a, limits noncitizens' eligibility for certain federal housing assistance programs, including public housing, HCVs, and PBRA.

52. Congress initially added Section 214 in 1980 to prohibit federal financial assistance for housing to certain limited categories of immigrants.[4] This provision was amended in 1981 to expand the categories of immigrants excluded from receiving federal financial assistance.[5]

53. In 1986, HUD promulgated a final rule (the "1986 Rule") mandating that all prospective and current recipients of housing assistance submit evidence of eligibility for every person occupying the federally subsidized unit.[6] The 1986 Rule also provided guidelines for evicting or terminating assistance to families that failed to provide evidence of eligibility for all occupants of the unit.[7]

54. The 1986 Rule was challenged in court, and a federal district court enjoined the Rule, finding that it raised constitutional concerns because it denied tenants who were eligible to receive housing assistance the right to cohabitate with family members who were ineligible.[8] In light of this ruling, HUD subsequently rescinded the 1986 Rule.

55. In 1988, Congress amended Section 214 to expressly allow mixed status families receiving federal housing assistance as of February 5, 1988, to continue receiving such assistance (the "1988 Amendments"). The 1988 Amendments included a "preservation of families" provision that authorized public housing authorities and local governments to (1) provide indefinite "continued provision of financial assistance" to mixed status families in which the head of household or spouse had eligible status "if necessary to avoid the division of a family"

[4] Housing and Community Development Act of 1980, Pub. L. No. 96-399, § 214, 94 Stat. 1614, 1637.
[5] Housing and Community Development Amendments of 1981, Pub. L. No. 97-35, § 329(a), 95 Stat. 357, 408.
[6] Restriction on Use of Assisted Housing, 51 Fed. Reg. 11,198, 11,199 (Apr. 1, 1986).
[7] *Id.* at 11,203-09.
[8] *See Yolano-Donnelly Tenant Ass'n v. Pierce*, No. CIV S-86-0846 MLS (E. D. Cal. Dec. 18, 1986) (order granting nationwide preliminary injunction).

and (2) "[d]efer the termination of financial assistance" for families whose head of household or spouse did not have eligible status, for up to three years.[9]

56. In adopting the 1988 Amendments, Congress explicitly indicated its disagreement with the 1986 Rule and clarified its intent to keep mixed status families together. As one Senator explained, the purpose of the 1988 Amendments was to uphold "the sanctity of the family."[10]

57. A House Committee Report discussing the 1988 Amendments explained that the changes were required because HUD "incorrectly interpreted the original Act" in its 1986 Rule.[11] The Committee recognized the deleterious effects of the 1986 Rule, which would result in "the mandatory eviction of thousands of families now residing in federally-subsidized housing," including the eviction of "individuals who are citizens or who are properly documented aliens because other members of their household cannot meet the documentation requirements," "the denial of admission to families which include citizens and properly documented aliens because not all family members can be properly documented," and the "imposition of documentation and verification requirements . . . which are not only unduly burdensome, but also impossible even for some citizens to meet."[12] To address these concerns, the House Committee Report reiterated "the original intent of Congress that families in which at least one person is eligible are not disqualified" from accessing federal housing assistance.[13]

58. In the 1988 Amendments, Congress also clarified that noncitizens 62 years of age or older were only required to provide a declaration of eligible immigration status and were not

[9] Pub. L. No. 100-242, § 164, 101 Stat. 1815, 1860 (1988).
[10] 133 Cong. Rec. 37,657 (1987) (statement of Sen. Armstrong).
[11] H.R. Rep. No. 100-122, pt. 1, at 50 (1987).
[12] *Id.* at 49.
[13] *Id.* at 50.

subject to the additional verification requirements in the statute.[14] Pursuant to regulations subsequently adopted by HUD, noncitizens 62 years and older must also submit proof of age.[15]

59. In 1995, HUD promulgated a final rule (the "1995 Rule") to implement Section 214. The 1995 Rule required housing providers to make federal financial assistance available to all mixed status families, with the amount of assistance prorated based on the number of eligible family members.[16] Under the 1995 Rule, family members could elect not to contend that they had eligible immigration status. Family members who chose the "do not contend" option could still live in the household but they would not receive federal rental assistance and the household's rental assistance would be prorated accordingly.[17]

60. In the 1995 Rule, HUD explained that a "mixed family with eligible children and two ineligible adults (the adults are neither U.S. citizens or meet one of the six specified categories of eligible immigration status) may be eligible for prorated assistance."[18] The 1995 Rule further explained that an "eligible mixed family who requests prorated assistance must be provided prorated assistance."[19]

61. In promulgating the 1995 Rule, HUD rejected comments suggesting that proration of assistance was inconsistent with Section 214 and emphasized that "[p]roration of assistance is consistent with the preservation of Families provision of Section 214" and the Congressional intent to protect the sanctity of the family.[20]

[14] Pub. L. No. 100-242, § 164(d), 101 Stat. 1815, 1861-62 (1988).
[15] 24 C.F.R. § 5.508(b)(2).
[16] Restrictions on Assistance to Noncitizens, 60 Fed. Reg. 14,816, 14,860 (Mar. 20, 1995).
[17] *Id.* at 14,856; *see also* 24 C.F.R. § 5.508(e) (2025).
[18] 60 Fed. Reg. at 14,817.
[19] *Id.* at 14,860 (codified at 24 C.F.R. § 5.520(a)).
[20] *Id.* at 14,822.

62. HUD also rejected the suggestion that eligible noncitizens over 62 years of age be required to provide documentary verification of eligible status, noting that it interpreted the statute to "provide that individuals 62 years of age or older and receiving assistance on the effective date of the final rule, like citizens or nationals, need only submit a declaration in writing, and proof of age."[21]

63. Against the background of HUD's 1995 Rule, Congress amended Section 214 in 1996 (the "1996 Amendments") to confirm that prorated financial assistance should be provided to mixed status families.[22] The 1996 Amendments added the language on proration of benefits that remains in Section 214 to this day:

> *If the eligibility for financial assistance of at least one member of a family has been affirmatively established* under the program of financial assistance and under this section, and the ineligibility of one or more family members has not been affirmatively established under this section, any financial assistance made available to that family by the applicable Secretary *shall be prorated*, based on the number of individuals in the family for whom eligibility has been affirmatively established under the program of financial assistance and under this section, as compared with the total number of individuals who are members of the family.[23] (emphasis added)

64. The 1996 Amendments did not limit this proration scheme to families receiving benefits as of a specific date or set a time limit on how long a family could receive prorated assistance.

65. The 1996 Amendments also specified that while HUD could terminate assistance to an individual or family for two years if they permitted an ineligible individual to reside in a federally subsidized unit, this penalty "shall not apply to a family if the ineligibility of the

---

[21] *Id.* at 14,818.
[22] Use of Assisted Housing by Aliens Act of 1996, Pub. L. No. 104-208, div. C, § 572, 110 Stat. 3009-546, 3009-684 (1996) (codified at 42 U.S.C. § 1436a(b)(2)).
[23] *Id.* § 572, 110 Stat. at 3009-684; *see also* 42 U.S.C. § 1436a(b)(2) (emphasis added).

ineligible individual at issue was considered in calculating any proration of assistance provided for the family."[24]

66. As such, through the 1996 Amendments, Congress provided a statutory right to prorated housing assistance for mixed status households, including those with family members who elected not to contend eligibility.[25]

67. The 1996 Amendments did not alter the statutory language exempting noncitizens 62 years and older from additional verification procedures beyond a declaration and proof of age.[26]

68. After the 1996 Amendments, HUD published an interim rule that continued to provide prorated financial assistance to mixed status families based on the percentage of family members eligible for assistance.[27] In 1999, HUD adopted a final rule.[28]

69. Congress subsequently amended Section 214 in 1998, 2000, and 2016, but has not altered the statutory language requiring prorated financial assistance to mixed status families, imposed time limits on the provision of prorated benefits, or substantively changed the documentation requirements for individuals applying for federal housing benefits.

[24] Pub. L. No. 104-208, div. C, § 575, 110 Stat. at 3009-687; *see also* 42 U.S.C. § 1436a(e).
[25] 42 U.S.C. §§ 1436a(b)(2), (d)(6).
[26] Pub. L. No. 104-208, div. C, § 574, 110 Stat. at 3009-686 (codified at 42 U.S.C. § 1436a(d)(1)(A)).
[27] Revised Restrictions on Assistance to Noncitizens, 61 Fed. Reg. 60,535 (Nov. 29, 1996). While the interim rule suggested that housing authorities could opt out of complying with Section 214, *see id.* at 60,537, Congress amended the statute in 1998 to remove the statutory language that HUD relied upon in the interim rule, *see* Quality Housing and Work Responsibility Act of 1998, Pub. L. No. 105-276, § 592(a), 112 Stat. 2461, 2653-54 (1998). HUD's final rule omitted the opt-out language.
[28] Revised Restrictions on Assistance to Noncitizens, 64 Fed. Reg. 25,726 (May 12, 1999).

70. Congress has narrowed immigrants' eligibility for various public benefit programs, most recently through the 2025 One Big Beautiful Bill Act (OBBBA), without altering mixed status families' eligibility for prorated housing assistance.

71. During the first Trump Administration, HUD published a proposed rule (the "2019 Proposed Rule") that attempted to withdraw federal housing assistance from mixed status families and impose new documentation requirements for citizens. But that rule was never finalized, and it was withdrawn in 2021.[29]

72. As is evident from the legislative and regulatory history, Congress made clear its intent to enable families with at least one eligible member to participate in subsidized housing programs, HUD promulgated the prorated assistance scheme as a mechanism to fulfill that intent, and Congress quickly approved prorated assistance by amending the statute to specifically authorize it.

## II. The Final Rule Departs from Decades of Statutory Enactments and Regulations

73. In February 2026, HUD published a notice of proposed rulemaking (the "2026 NPRM"), through which HUD proposed to revise its regulations implementing Section 214 to strip federal housing assistance from tens of thousands of mixed status families and to drastically expand verification requirements.[30]

74. The 2026 NPRM required every member of a household to affirmatively establish citizenship or eligible immigration status in order to access federal housing assistance. Through the NPRM, HUD proposed to eliminate the option for applicants and tenants[31] not to contend

---

[29] *Housing and Community Development Act of 1980: Verification of Eligible Status,* 84 Fed. Reg. 20,589 (May 10, 2019), *withdrawn*, 86 Fed. Reg. 17,346 (Apr. 2, 2021).
[30] *Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. 8151 (proposed Feb. 20, 2026) (to be codified at 24 C.F.R. pt. 5).
[31] References to "tenants" who are affected by the Final Rule include families living in public housing or participating in the HCV program (including those residing in PBV units).

eligibility. Under the proposed rule, prorated assistance would only be allowed for a brief duration pending verification of the eligible status of all family members.[32]

75. The 2026 NPRM also proposed various other changes to existing documentation requirements. Significantly, the 2026 NPRM proposed to eliminate the current regulatory provisions allowing seniors 62 and older to provide only a declaration of eligibility and proof of age.[33]

76. In addition, HUD proposed to require the use of the Systematic Alien Verification for Entitlements ("SAVE") database to verify citizenship status of *all* tenants and applicants. Under current regulations, SAVE is used to verify the eligible immigration status of noncitizen applicants younger than 62 years old who attest that they have eligible immigration status. HUD also proposed to require tenants and applicants to provide documentation of U.S. citizenship or eligible immigration status if primary SAVE verification cannot confirm citizenship.[34]

77. In the NPRM, HUD justified these revisions as necessary to "bring HUD's Section 214 implementing regulations into greater alignment with the wording and purpose of Section 214," to "align with the current Administration's priorities," including as reflected in President Trump's Executive Order 14,218 ("Ending Taxpayer Subsidization of Open Borders"),[35] and to "reduce unnecessary regulatory burdens, enhance the effectiveness of those regulations that are necessary, and promote principles underlying the rule of law."[36]

---

[32] *Housing and Community Development Act of 1980: Verification of Eligible* Status, 91 Fed. Reg. at 8151, 8154–56, 8161.
[33] *Id.* at 8151, 8155, 8165.
[34] *See id*. at 8155–57, 8165–66; *cf.* 24 C.F.R. §§ 5.508(b), 5.512(a).
[35] Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 25, 2025).
[36] *Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. at 8153–54.

78. The 2026 NPRM was accompanied by a Regulatory Impact Analysis ("RIA"). The RIA estimated that the proposed rule would displace over 15,500 mixed status families from federally subsidized housing. For approximately 5,000 additional mixed status families, HUD expected that ineligible members would choose to leave the household so that the remaining eligible family members could continue to receive assistance. Ultimately, the RIA concluded that the "primary effect [of the proposed rule] would be to assist proportionally fewer households and household members."[37]

79. HUD received over 16,000 comments in response to the 2026 NPRM. Many of these comments highlighted the adverse impacts of the proposed rule, including: placing mixed status families, the elderly, and other vulnerable groups at heightened risk of homelessness and the associated negative health and safety impacts; imposing significant burdens on public housing authorities and affordable housing providers; and straining state and local safety net systems.[38]

80. On November 12, 2026, HUD promulgated the Final Rule, which is scheduled to become effective on December 14, 2026. The Final Rule is substantially the same as the proposed rule and did not meaningfully address the points raised by commenters who opposed the proposed rule. In response to comments, HUD made only two changes that do little to mitigate the Rule's adverse impacts. First, the Final Rule allows tenants to obtain an extension of up to 60 days to obtain documentation if they certify that they meet certain conditions. Second,

---

[37] RIA, *supra* note 3, at 17.
[38] *See Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. 72,978, 72,980, 72,982–73,015 (Nov. 12, 2026) (to be codified at 24 C.F.R. pt. 5) [hereinafter Final Rule].

the Final Rule requires the disclosure of Social Security numbers by individuals claiming U.S. citizenship.[39]

81. The Final Rule ends prorated assistance for mixed status families. Like the 1986 Rule (which was struck down by the courts and repudiated by Congress) and the 2019 Proposed Rule (which was never finalized), the Final Rule requires every family member residing in a federally subsidized housing unit to affirmatively demonstrate U.S. citizenship or eligible immigration status. Mixed status families must either ask ineligible members to move out, or the entire family will have their federal housing assistance terminated.[40]

82. Under the Final Rule, prorated assistance will only be available for the limited time period while the eligibility of all family members in a household is being verified. Despite HUD regulations allowing for ongoing proration of mixed status family assistance for decades, HUD now indicates that this limited assistance should be rarely applicable and, even then, of short duration.[41]

83. Under the Final Rule, tenants in mixed status families who have not previously submitted evidence of citizenship or eligible immigration status must provide evidence of citizenship or eligible status within 90 days of the Final Rule's effective date—i.e., by March 2027. Other tenants, including those who have previously attested that they were eligible noncitizens 62 years of age and older and were therefore not previously required to provide documentation of eligibility, are now required to provide this documentation by the time of their next annual recertification.[42]

[39] *See id.* at 72,978–79, 72,981.
[40] *See id.* at 72,978–79, 73,025–28.
[41] *See id.* at 72,979, 72,981, 73,028.
[42] *See id.* at 72,978–79, 72,981, 73,026.

84. The Final Rule also imposes error-prone and onerous requirements to verify the eligibility of noncitizen seniors and tenants who have previously chosen not to contend eligibility.[43]

85. Section 214 and HUD's current regulations impose different verification requirements based on the age and citizenship status of an applicant. For individuals who submit declarations stating that they are U.S. citizens or nationals, public housing authorities have the discretion to request additional documentation of citizenship status. Individuals who attest that they are eligible noncitizens and are under 62 years of age are required by Section 214 to submit additional documentation of their immigration status and must have their eligibility verified through the SAVE system. Individuals who are eligible noncitizens and are 62 years or older, however, are only required to submit a declaration and proof of age and are not subject to SAVE verification or additional documentation requirements. Finally, individuals who choose not to contend eligibility are not required to provide documentation of eligibility. These individuals' decision not to establish eligibility is then considered when calculating the amount of a family's prorated assistance.[44]

86. Under the Final Rule, however, *all* tenants and applicants are subject to new verification and documentation requirements. For individuals who attest that they are U.S. citizens or nationals, their citizenship status must first be verified through the SAVE database. If SAVE cannot confirm their citizenship status, these individuals will be required to provide additional documentation of citizenship status. For noncitizen tenants and applicants, including those 62 years and older, the Final Rule requires that they produce acceptable evidence of eligible immigration status by producing original or certified copies of documents designated by

[43] *See id.* at 72,979, 72,981, 73,026–27.
[44] *See* 42 U.S.C. § 1436a(b)(2), (d)(1)–(2); 24 C.F.R. §§ 5.508(b), (e), 5.512(a), 5.520 (2025).

the U.S. Department of Homeland Security ("DHS") as evidence of immigration status. They must provide this information regardless of whether a housing authority is able to verify their eligibility through SAVE.[45] The Final Rule also requires tenants to submit to the verification process each time their immigration status changes, rather than just one time during a period of continued occupancy in a federally subsidized unit.

87. Finally, the Final Rule requires housing authorities and property owners to notify all tenants and applicants that the housing authority or owner "must inform DHS immediately whenever personnel determine that any member of a household is present in the U.S." unlawfully.[46]

88. The Final Rule allows housing authorities to temporarily defer termination of assistance to mixed status families in certain circumstances for six-month periods up to a maximum of eighteen months, but few families are likely to take advantage of this temporary reprieve. As HUD notes in the RIA, the notice through which housing authorities make tenants aware of this deferral option must simultaneously tell tenants that the housing authority will immediately report to DHS as soon as they determine that any household member is in the country in violation of federal immigration law.[47] As such, the RIA predicts that this would "deter mixed families from receiving . . . housing assistance," and would lead these families to "choose to leave instead of availing the allowed period of deferral."[48]

---

[45] *See* Final Rule, *supra* note 38, at 72,979, 72,981, 73,026–27.
[46] *Id.* at 72,979, 73,026.
[47] *See id.* at 72,979, 73,027-28.
[48] RIA, *supra* note 3, at 45.

## III. The Final Rule Will Profoundly Harm Thousands of Plaintiffs' Residents and Disrupt Affordable Housing in Plaintiffs' Jurisdictions

### A. Thousands of Residents in Plaintiffs' Jurisdictions Will Lose Access to Safe, Stable Housing As a Result of the Final Rule

89. HUD estimates that there are approximately 20,000 mixed status households, with an estimated 79,300 members, who will be impacted by the Rule.[49]

90. Plaintiff Housing Authorities provide assistance to, and Plaintiff Localities are home to, thousands of people who will be directly affected by the Rule. In Boston, BHA provides prorated housing assistance to over 500 mixed status families. In LA City, HACLA provides federal housing assistance to over 1,800 mixed status families with approximately 7,400 members. LACDA separately provides prorated housing assistance to over 300 mixed status families. In New York City, NYCHPD provides prorated federal housing assistance to over 350 mixed status families, which includes over 1,280 individuals. In San Francisco, SFHA provides federal housing assistance to an estimated 202 mixed status families consisting of 765 tenants. Fresno Housing provides federal housing assistance to 365 mixed status families, HACSB provides federal housing assistance to 162 mixed status families, and SDHC provides federal housing assistance to 194 mixed status families. Santa Clara County is home to an additional 157 mixed status families with 675 individuals receiving prorated housing assistance administered by the Santa Clara County Housing Authority. King County is home to approximately 130 mixed status families who receive housing assistance through the King County Housing Authority ("KCHA"). Chicago and Seattle are each home to dozens of mixed status families.

91. Under the Final Rule, these mixed status families face an impossible choice: either a loved one must leave the home so that remaining eligible family members may continue

---

[49] *See id*. at 9.

to receive housing assistance, or the family must forgo all of their federal housing assistance in order to remain together.

92. In effect, the Final Rule requires eligible individuals to choose between accessing assistance for which they are statutorily eligible and their right to live with their family.

93. For the vast majority of households, this is not a choice at all. Most mixed status families consist of children with eligible status and at least one parent with ineligible status. For these families, separation is not a viable option, and they will be forced out of their homes as a result of the Final Rule. HUD's own analysis predicts that there are over 15,500 mixed status families, totaling about 61,861 people, for whom separation is not a realistic choice and who will be required to leave subsidized units and lose their federal assistance.[50]

94. According to HUD's estimates, 70 percent of family members in mixed status families have eligible status. Children with eligible status, who reside in almost three-quarters of mixed status households, are at particular risk of displacement under the Final Rule.

95. Across Plaintiffs' jurisdictions alone, thousands of children in mixed status families will be harmed by the Final Rule, including approximately 2,750 children in families receiving assistance through HACLA; approximately 890 children in families served by BHA; over 500 children in families served by LACDA; over 600 children in families served by Fresno Housing; over 430 children in families served by NYCHPD; over 260 children in families served by SFHA; over 280 children in families served by HACSB; approximately 200 children in families served by SDHC; and approximately 290 children receiving assistance in Santa Clara County.

[50] *See id.* at 47.

96. In addition, the Final Rule's onerous verification and documentation requirements increase the risk that eligible individuals will have their housing assistance terminated, regardless of whether they live in mixed status households.

97. The Final Rule requires for the first time that U.S. citizens and nationals must have their citizenship verified through SAVE, despite significant concerns about whether SAVE can accurately determine citizenship status. The Final Rule will also impose mandatory documentation requirements on U.S. citizens whose identities cannot be verified by SAVE, whereas current regulations do not require housing authorities to obtain documentation from U.S. citizens. Some Plaintiff Housing Authorities, such as HACLA, LACDA, and NYCHPD, do not currently require documentary proof of citizenship for all applicants who attest that they are U.S. citizens.

98. At least 3.8 million U.S. citizens lack documentation of citizenship, and approximately 21.3 million do not have proof of citizenship readily accessible.[51] Lack of, or inability to access, government-issued identification and underlying documents like birth certificates disproportionately affects low-income communities.

99. The Final Rule also requires for the first time that eligible noncitizen seniors 62 years and older and tenants who have previously chosen not to contend eligibility submit to SAVE verification and produce documentary records to establish their eligible immigration status.

100. Seniors may not have these documents easily available, especially where they were not required to produce documentary proof when they initially applied for assistance. Many

[51] Kevin Morris & Cora Henry, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available*, Brennan Ctr. for Just. (June 11, 2024), https://www.brennancenter.org/our-work/analysis-opinion/millions-americans-dont-have-documents-proving-their-citizenship-readily.

senior tenants also face language barriers and mobility restrictions, further impeding their ability to obtain the required documentation. The documentation requirements are also likely to be prohibitively costly for many low-income individuals that rely on housing assistance. For example, obtaining a U.S. passport or copy of a green card costs hundreds of dollars per person.

101. Mixed status families, as well as eligible residents who lose their federal housing assistance because they cannot demonstrate eligibility, will face significant difficulty finding alternate housing in Plaintiff Localities, where the affordable housing stock is already scarce, and many will experience housing instability or homelessness.

102. Plaintiff Localities have extremely high housing costs and low rental vacancy rates, and represent some of the most competitive rental markets in the nation.

103. San Francisco is currently experiencing an extreme shortage of rental housing, with an apartment vacancy rate of just 2.2 percent.[52] A household spending no more than 30 percent of its income on rent in San Francisco would need an income of $150,000 per year to afford the median market rent for a two-bedroom unit.

104. The median rental listing in Boston is $3,400, which means a family must earn at least $136,000 per year to afford rent without spending more than 30 percent of their income. The rental vacancy rate in Boston is 3.2 percent.

105. LA City faces an extreme scarcity of affordable housing, coupled with prohibitive market rates. As of the third quarter of 2026, the local rental vacancy rate for market rate housing is just 5.4 percent, but vacancy rates for housing affordable to lower-income families are much lower. The average asking rent for a two-bedroom market-rate unit is $2,849. A household would need an income of almost $114,000 to afford a two-bedroom apartment without spending

---

[52] See Christian Leonard, San Francisco's Rental Vacancy Rate is Extreme, S.F. Chron. (July 12, 2026), https://www.sfchronicle.com/realestate/article/sf-apartments-vacant-22336259.php.

more than 30 percent of its income. In LA County more broadly, a household would need an income of over $92,000 dollars to afford an average market rent unit without spending more than 30 percent of its income.

106. In New York City, the average rent for mixed status households with vouchers is $2,358 without accounting for utilities. Based on the 2023 New York Housing and Vacancy Survey, the city-wide median rent is $1,651. The city-wide net rental vacancy is under 1.5 percent, and the median asking rent for homes available for rent is $3,000. For a household to afford this median asking rent at 30 percent or less of household income, they would need an income of at least $120,000.

107. Rental costs in Chicago increased 9.5 percent over the past three years, the biggest increase in any major American city. Chicago has a 4.6 percent vacancy rate, with about 17 renters competing for every available apartment. A Chicago household would need a total income of at least $80,000 to affordably rent a two-bedroom apartment for 30 percent or less of the family's annual income.

108. Santa Clara County likewise has an expensive housing market, with an average asking rent of $3,354 per month. A household spending no more than 30 percent of its income on rent would need an income of over $134,000 to afford rent in Santa Clara County. Santa Clara County has a rental vacancy rate of 4 percent.

109. In San Diego, the median rent is $2,453, and a household would need an income of nearly $100,000 to afford a median rent unit at 30 percent or less of household income.

110. According to the City of Santa Barbara's 2026 Rental Housing Survey, median advertised apartment rents in April 2026 were $2,795 for a one-bedroom unit, $3,910 for a two-bedroom unit, and $4,991 for a three-bedroom unit. Additionally, commercial market research

published in August 2026 reported a multifamily rental vacancy rate of just 2.8% in the Santa Barbara submarket. These conditions demonstrate the substantial financial and practical challenges that low-income mixed-status households receiving assistance from HACSB would face in securing alternative rental housing if their federal rental assistance were terminated.

111. In Seattle, average rent is $2,028 per month, with an average vacancy rate of 6.1 percent. A household would need an income of over $81,120 to afford average rent at 30 percent or less of household income. King County—home to Seattle and other localities in Washington State—has a 4.9 percent vacancy rate. A household in the greater King County area would need a total income of at least $92,000 to affordably rent a two-bedroom apartment for 30 percent or less of the family's annual income.

112. In Providence, the median rent is $1,408, with an average vacancy rate of 3.9 percent. A household would need an income of over $56,000 to afford average rent at 30 percent or less of household income.

113. HUD estimates that the nationwide average income of a mixed status family receiving federal housing assistance is $27,000.[53] While the average income for mixed status families receiving assistance is lower in some Plaintiff Localities and higher in others, the average mixed status family receiving federal housing assistance would be unable to afford market rent housing in any of Plaintiff Localities.

114. Instead, once they lose federal housing assistance, many of these families will face a heightened risk of homelessness and housing instability and will increasingly become reliant on shelter and other support services provided by the Localities. Other families may be forced into crowded, sub-standard housing that is unsafe or unhealthy.

---

[53] RIA, *supra* note 3, at 15.

115. Even where families displaced by the Final Rule are able to afford alternate housing, many will be rent burdened—i.e., spending more than 30 percent of income on housing—and will have less money to afford other basic necessities like food and healthcare.

116. Having to absorb the burden of an extended housing search and costly relocation can destabilize even the most secure families. Low-income families who face housing insecurity because of the Final Rule are likely to experience adverse economic impacts. Housing insecurity will make it more difficult for adults in these households to sustain employment, further harming their economic prospects and ability to afford housing and other basic necessities. By forcing mixed status families to separate or lose their assistance, the Final Rule also makes it difficult for multigenerational families to assist in caregiving, including grandparents providing unpaid childcare for young children, imposing further economic burdens on low-income families. These economic impacts will have knock-on effects for employers and local economies.

117. Individuals and families confronting housing instability as a result of the Final Rule also face numerous adverse health impacts. It is well established that access to stable affordable housing promotes the health and well-being of families. By contrast, housing instability is associated with food insecurity, more frequent hospital visits, and an increased risk of mental and behavioral health problems, including in children.

118. These negative impacts will be particularly devastating for children in mixed status families. Housing instability negatively impacts the physical and mental health of children, impedes their cognitive development, and leads to poorer life outcomes as adults. Housing instability also leads to lower student retention rates, contributes to truancy and expulsions, and harms these children's chances of academic and professional success and economic mobility.

119. The harms inflicted on children by the Final Rule are particularly pernicious because more than 90 percent of children in mixed status families are U.S. citizens or have eligible status.[54] These children would otherwise be eligible to receive housing subsidies but for the fact that they live with a parent or other caregiver without eligible status.

120. Adequate and stable housing is also critically important for older adults. Older adults are the fastest-growing age group among people experiencing homelessness, in part because they rely on fixed incomes that have failed to keep pace with rising rents. Studies have shown that once older adults become homeless, they generally face more barriers to regaining housing than younger people because of chronic health conditions, disabilities, and limited opportunities to work to increase income. Becoming homeless later in life takes a serious health toll on older adults and increases their risk of dying prematurely.

121. While HUD estimates that as a result of the Final Rule most mixed status families will forgo federal housing assistance—and will face the myriad harms discussed above—HUD projects that an additional 4,391 mixed status families will make the choice for ineligible members to leave the household so that the remaining family members can continue to receive federal housing assistance.[55] But the families who make this painful choice to separate will also suffer long-term psychological harms. Family separations undermine family stability and are particularly harmful for children. Even temporary separation can have negative downstream effects on the health and educational attainment of these children, and can lead to stress, trauma, and attachment deficits.

---

[54] *See* Erik Gartland & Sonya Acosta, *Administration Plan Targeting Immigrants Would Take Away Rental Assistance, Create New Barriers,* Ctr. on Budget and Pol'y Priorities (Dec. 12, 2025), https://www.cbpp.org/research/housing/administration-plan-targeting-immigrants-would-take-away-rental-assistance-create.

[55] RIA, *supra* note 3, at 47.

122. If ineligible members leave the unit, HUD regulations may force remaining eligible family members to move to a smaller unit based on limits governing the appropriate number of bedrooms, maximum subsidy, and rent burden for a household. In the HCV program, the burden for this move will be placed on the family. This burden is likely to be quite significant in Plaintiff Localities, many of which have low rental vacancy rates and limited affordable housing options.

### B. The Final Rule Will Result in Fewer Households Receiving Assistance and Will Diminish the Quantity and Quality of Affordable Housing in Plaintiffs' Jurisdictions

123. The Final Rule will not only prohibit mixed status households from receiving housing assistance, but it will result in fewer total households receiving assistance. The Rule will also decrease the quality and quantity of available affordable housing units.

124. As discussed above, under long-established statutory and regulatory requirements, rental assistance for mixed status households is prorated to account for only the number of eligible family members. Ineligible members do not receive housing assistance and are required to pay an unsubsidized share of the rent.

125. Because their federal assistance is prorated, mixed status families receive a lower federal subsidy than equally sized households made up entirely of eligible members. Housing authorities can therefore serve more families because available funding can be spread around more households.

126. By transferring federal assistance from mixed status families to families with all eligible members, HUD acknowledges the Final Rule's net effect would be that fewer households will receive housing assistance absent further federal spending. Congress could

appropriate additional funds for housing assistance, but HUD recognizes that outcome is unlikely.[56]

127. In fact, HUD estimates that 31,000 *fewer eligible individuals* will receive housing assistance under the Final Rule than under current regulations. Under the current regulations, 55,100 eligible individuals residing in mixed status families receive federal housing assistance. But because fully eligible households require a greater subsidy, HUD projects that only 24,100 eligible individuals residing in fully eligible households will be assisted under the Final Rule.[57]

128. HUD estimates that, under the Final Rule, it would require an additional $311 million to $385 million to provide housing assistance to the same number of households as under the current regulations.[58]

129. The Final Rule will also significantly disrupt the availability of affordable housing units, including in Plaintiffs' jurisdictions.

130. HUD acknowledges that, as a result of the Final Rule, public housing authorities are likely to leave units vacant to defer the costs of turnover and operation. HUD also notes that the Final Rule will likely lead to reduced maintenance, security, and other services for tenants.[59] Plaintiff Housing Authorities will be forced to decrease the number of households served or would need millions of dollars in additional funding to provide the same level of service, as discussed further below. *See* Part IV.A, *infra*.

131. HUD also notes that the Final Rule will result in a reduction in the number of HCV program vouchers. Many private property owners, including in Plaintiffs' jurisdictions, rely on HCVs as a reliable source of rental income. As discussed further below, the sudden mass

---

[56] *See* Final Rule, *supra* note 38, at 73,000; RIA, *supra* note 3, at 17.
[57] *See* RIA, *supra* note 3, at 17.
[58] *Id.* at 19.
[59] *Id.* at 18.

subsidy terminations and evictions caused by the Final Rule will result in lost rent, eviction and turnover costs, and other adverse financial impacts to these properties. In addition, because the number of assisted households will decline, fewer vouchers are likely to be issued—as HUD acknowledges in the RIA.[60] This will deprive private property owners of a vital source of income, and likely reduce the number of private property owners choosing to participate in the HCV program, thus reducing Plaintiff Localities' already severely limited affordable housing stock. *See* Part IV.A, *infra*.

## IV. The Final Rule Will Impose Significant Costs on Plaintiffs

### A. Plaintiff Housing Authorities Will Incur Substantial Costs to Implement the Final Rule While Receiving Significantly Lower Revenues

132. The Final Rule imposes considerable burdens and costs on Plaintiff Housing Authorities, while simultaneously depriving them of essential revenue. Many Plaintiff Housing Authorities face significant budgetary challenges, and the Final Rule further strains their ability to serve low-income tenants with already limited resources and long waitlists for subsidized housing.

133. Plaintiff Housing Authorities will be required to expend considerable administrative resources to implement the Rule. Almost immediately, they will need to begin the process of identifying affected households; drafting and providing the required notices to those households; amending policies, administrative plans and forms; training staff on the changed regulations; and responding to questions from concerned tenants, applicants, and stakeholders about the requirements and impacts of the Final Rule. Indeed, HUD sent an email to several Plaintiff Housing Authorities on November 20, 2026, highlighting key changes under the Final

[60] *Id.* at 17.

Rule and informing housing authorities they must send a notice to tenants within 30 days of the rule's effective date and "should begin preparing immediately to implement this rule."

134. Plaintiff Housing Authorities, as well as local governments that work in partnership with housing authorities, will also have to expend considerable resources to attempt to re-house families in different units that correspond with their household size. For those families who forgo federal housing assistance, Plaintiff Housing Authorities' staff will spend time counseling and connecting these families with local resources, including those provided by Plaintiff Localities. For those mixed status families where ineligible members leave, the remaining family members may be required to move pursuant to HUD regulations and housing authority policies about the appropriate number of bedrooms in a unit based on family size and the anticipated rent burden given the household's income. For mixed status families in public housing, Plaintiff Housing Authorities will face administrative burdens re-housing those remaining family members in appropriately sized units. For families participating in the HCV program, while the family is responsible for the move, Plaintiff Housing Authorities' staff will still spend time helping these families identify suitable units.

135. These administrative burdens are costly. SFHA, for example, estimates that the cost of preparing and disseminating the notices required by the Final Rule, preparing related tenant communication plans, and training staff and contractors to implement the Final Rule could reasonably exceed $150,000. SFHA anticipates needing to spend at least an additional $300,000 in staff and contractor time to obtain and verify immigration documentation from hundreds of eligible noncitizen seniors aged 62 and above who previously provided a signed declaration in support of their eligibility. This cost is particularly acute because these seniors may require language access services, accommodations related to disability, or individualized assistance on

how to obtain the required documentation. HACLA likewise estimates they will need to make a one-time $300,000 expenditure to mail notices to all households and provide related educational outreach to residents, participants, applicants, and landlords. HACLA will also need to spend an additional $100,000 to train staff on the new regulations and resulting changes in policies. Likewise, BHA and HACSB estimate that they will incur hundreds of thousands of dollars in costs to send out notices to tenants, amend existing policies and train staff, and help tenants identify alternate housing. Fresno Housing expects to spend nearly $50,000 in administrative costs associated with notices, policy amendments, and counseling tenants.

136. The burdensome documentation and verification requirements of the Final Rule will also require Plaintiff Housing Authorities to incur significant additional costs.

137. The Final Rule will require Plaintiff Housing Authorities to use SAVE to verify the citizenship status of individuals who attest they are U.S. citizens. Under current regulations, Plaintiff Housing Authorities are not required to verify U.S. citizenship through SAVE. Where SAVE fails to establish an individual's citizenship status, Plaintiff Housing Authorities will be required to collect documentation of citizenship status.

138. This burden is significant, particularly for those Housing Authorities that do not already require individuals who attest they are U.S. citizens to provide documentation of citizenship.

139. For example, HACLA's administrative plan only requires individuals to submit a declaration of U.S. citizenship or nationality as evidence of citizenship. HACLA therefore estimates it will need to spend almost $4 million in SAVE verification administrative costs for Section 8 tenants who are U.S. citizens and more than $680,000 for public housing tenants.

140. LACDA similarly does not require documentary proof of citizenship and has over 50,000 tenants who have not previously provided documentation of citizenship. Even under a conservative estimate of 55 minutes per tenant, verifying the eligibility of the more than 50,000 individuals would take over 48,000 hours and cost nearly $3,000,000 dollars.

141. NYCHPD also does not currently require individuals who declare they are citizens to provide documentation. Reviewing all participant files to identify and obtain additional documentation will be labor-intensive and administratively burdensome. NYCHPD estimates that one staff person will be able to process three cases per day. Given the number of tenants requiring verification, the total burden on staff time dedicated to meeting the Final Rule's verification and documentation requirements will be significant, and will likely require staff to allocate time away from other essential work. NYCHPD estimates the cost of verifying the status of the Section 8 tenants who are U.S. citizens will be at least $5 million.

142. Similarly, the Final Rule will, for the first time, require Plaintiff Housing Authorities to collect documents and verify the immigration status of individuals who attest that they are eligible noncitizens and are 62 years and older and tenants who have previously chosen not to contend eligibility.

143. BHA has over 2,000 senior tenants who attested being eligible noncitizens. Similarly, SFHA has over 315 eligible noncitizens senior tenants whose status would now need to be verified under the Final Rule.

144. HACSB has over 200 tenants who previously did not contend eligibility, in addition to several senior noncitizen tenants who were previously not required to provide documentation of eligible status. SDHC likewise has more than 220 tenants who did not contend eligibility, in addition to senior noncitizen tenants who were not required to provide

documentation. SDHC estimates that it will need to spend tens of thousands of dollars preparing notices and verifying mixed status family eligibility.

145. For tenants and applicants who do not have easy access to appropriate, unexpired documentation—particularly vulnerable groups like the elderly, disabled individuals, and survivors of domestic violence—Plaintiff Housing Authorities' staff will have to spend additional time helping them navigate the bureaucratic hurdles to secure the required documents.

146. For those individuals who are unable to provide documentation of citizenship or eligible status, Plaintiff Housing Authorities will have to take steps to terminate federal rental assistance and undertake informal hearing processes. The informal administrative process is lengthy and can result in multiple appeals.

147. Ultimately, Plaintiff Housing Authorities that administer public housing units and private owners (in the case of the HCV program) will have to evict mixed status families and eligible individuals who cannot meet the Final Rule's eligibility requirements and do not voluntarily separate or leave. Evictions and removals may only be accomplished through a judgment obtained from a court of competent jurisdiction, which in turn affords tenants a right of appeal. In California, evictions routinely take 6 to 12 months and cost far more than the $1,000-$4,000 per eviction that the Final Rule contemplates. HACLA estimates that, in California, a formal contested eviction process, including a jury trial, costs an average of $20,000, and HACLA could face eviction costs of $10,000,000 to evict families who cannot comply with the Final Rule's documentation requirements from public housing units. Fresno Housing estimates approximately $300,000 in costs associated with eviction proceedings.

148. In addition, Plaintiff Housing Authorities that administer public housing units and private owners (in the case of the HCV program) will incur substantial turnover costs, such as

repair and maintenance, to prepare units vacated by mixed status families for new tenant families.

149. HACLA, for example, estimates that it will cost $5,000 to $25,000 per unit to make public housing units available for new families, which will total $2,175,000 to $10,875,000.

150. BHA estimates that it costs roughly $15,000 per unit in turnover costs, and anticipates incurring approximately $1 million in turnover costs just for the affected public housing units vacated by mixed status families.

151. Fresno Housing similarly anticipates over $1 million in turnover and repair costs from vacating tenants.

152. SDHC estimates turnover and repairs from vacating tenants will cost $8,000 per unit, and an additional $2,500 for costs associated with an eviction proceeding.

153. At the same time as it imposes significant new costs on Plaintiff Housing Authorities, the Final Rule will also reduce their revenues.

154. For families who do not voluntarily leave and must be evicted, Plaintiff Housing Authorities and private owners are likely to face an extended period of time where households are not paying rent while eviction proceedings are ongoing. As discussed above, in California, even routine eviction proceedings can take between 6 to 12 months.

155. Even where families displaced by the Final Rule vacate their units, there will likely be a significant delay before the vacated units are re-leased. Under current regulations, HCV recipients in Los Angeles often take six months to over a year to find housing. In New York City, 50 percent of HCV recipients served by NYCHPD take between four to five months to find housing. Likewise, there are often delays in re-leasing public housing units. For example,

there is a more than 50 percent no-show rate for applicants HACLA calls to certify eligibility, which lengthens the time to re-lease these units. It often takes SFHA up to five months to lease up a vacant PBV unit and three-to-six months to lease up a unit with HCV recipients.

156. These delays are likely to be exacerbated by the new, onerous verification and documentation requirements imposed by the Final Rule, which will delay Plaintiff Housing Authorities' ability to make eligibility determinations for families currently on the waiting list for federal housing assistance.

157. The costs of these prolonged vacancies are likely to be severe. HACLA, for example, anticipates that more than 400 public housing units are likely to remain vacant for an extended period, resulting in millions of dollars in lost rental revenue. This does not account for other associated costs, including boarding up vacant units, or the follow-on impacts to the City of Los Angeles' housing market when hundreds of housing units are taken offline.

158. Because the Final Rule is expected to result in fewer households receiving federal housing assistance with higher subsidy amounts, Plaintiff Housing Authorities are also likely to see a decline in the number of HCVs issued.

159. For example, SFHA anticipates it would lose 65 vouchers under the Final Rule.

160. HACLA similarly anticipates that it would need to reduce the number of HCVs by at least 800 vouchers in order to cover the increased subsidy amount for the fully eligible families who would replace mixed status families. In order to serve the same number of households under the Final Rule, HACLA anticipates needing an additional $10.5 million in funding. Similarly, HACSB estimates that it will cost approximately $1.6 million more per year in increased housing assistance payments in order to reissue vouchers to the same number of fully eligible families as the number of mixed families who lose assistance, and LACDA

estimates it will cost $1.3 million more per year. Absent additional funding, HACSB and LACDA will have to issue significantly fewer vouchers.

161. Mixed status households served by SDHC receive an average HCV subsidy of $8,403 annually. Fully eligible households, by contrast, receive an average of $18,903 annually. Therefore, if all mixed status households in the HCV program were replaced by fully eligible households, the number of households receiving vouchers through SDHC would be more than halved.

162. Other Plaintiff Housing Authorities likewise face a decrease in the number of households served through their HCV programs. Because the average prorated subsidy received by mixed status families is significantly lower than the average subsidy for a similarly-sized fully eligible family, if all mixed status households receiving assistance were replaced by fully eligible households, the number of households receiving vouchers through Plaintiff Housing Authorities would be significantly reduced.

163. The reduction in vouchers expected under the Final Rule will likely have a significant negative impact on Plaintiff Housing Authorities' budgets. Housing authorities receive administrative fees from HUD based on the number of HCV vouchers that they administer. These administrative fees help pay for such expenses as staff and management salaries. In addition, voucher utilization rates feed into renewal funding for housing authorities that administer an HCV program.

164. SFHA, for example, estimates that it will lose up to $11,000 per month in HCV administration fees.

165. HACLA, for example, estimates that it will lose more than $1.5 million in HCV program administrative fees over the course of a year.

166. BHA anticipates that the reduced administrative fees and occupancy-based subsidy calculations will exceed $100,000 per month for at least a year.

167. NYCHPD estimates that more vacant units and fewer vouchers will ultimately cost HPD about $3.9 million in 2028 revenue for future housing assistance payments.

168. Absent significant additional funding, HACSB also projects that the Final Rule will result in a reduction in vouchers and a resulting decline in monthly administrative fees, which could in turn strain its ability to retain staff at the same time as the Final Rule imposes significant additional burdens on staff time.

169. For those Plaintiff Housing Authorities that administer public housing, rent collected from tenants is a critical revenue source for their operating budgets. Because fully eligible households pay less in rent, on average, than mixed status families, Plaintiff Housing Authorities that administer public housing units will therefore see a decline in rental revenue from these units. For HACLA, this annual rent loss is likely to amount to millions of dollars. As a result of this lost rental revenue, housing authorities will be more dependent on federal financial commitments through HUD's Public Housing Operating Fund to make up lost revenue. But because the Operating Fund has been chronically underfunded, the loss of this rental revenue puts Plaintiff Housing Authorities at heightened risk of fiscal shortfalls.

170. Increased public housing unit vacancies and the resulting operational and financial impacts are also likely to result in Plaintiff Housing Authorities receiving lower scores in HUD's Public Housing Assessment System. Housing authorities that earn higher scores on this assessment are generally more competitive for competitive HUD grants and capital funding.

171. The Final Rule will also squeeze private landlords, many of whom only operate a few units, rely on income through the HCV program, and may not be able to sustain the financial

burden. As discussed above, private landlords who participate in the HCV program (including those who operate PBV units) will incur significant costs related to evicting mixed status families and turning over units, while simultaneously seeing a decline in revenue as units remain vacant for extended periods of time and fewer households receive assistance. The disruption is likely to be particularly acute in places like New York City where the housing authorities are in shortfall. For example, because NYCHPD is in a shortfall, it cannot replace any Section 8 households with new vouchers until given permission by HUD—further delaying the re-leasing of privately owned affordable housing units.

172. The mass termination and disruption caused by the Final Rule is likely to cause many private landlords to withdraw from, or choose not to participate in, the HCV program. This, in turn, will make it more difficult for households to find affordable housing and ultimately decrease the number of vouchers housing authorities administer.

173. A reduction in private owner participation will also harm Plaintiff Housing Authorities' operations and finances. When fewer families succeed in using their vouchers, or when the leasing process is significantly slowed because fewer units are available, housing authorities must invest more time and resources to identify appropriate units. Housing authorities are also likely to see a decline in voucher utilization, which in turn influences budgetary allocations, and a reduction in administrative fees, which they receive for leased units. For example, based on SFHA's average monthly subsidy of approximately $2,455 per assisted household, even a 1 percent decline in voucher utilization would lead to a decrease in revenue of $4.8 million annually, and a 5 percent decline would cost $23.9 million.

174. Properties that have PBVs or participate in the PBRA program will also be impacted. These project-based commitments enable property owners to underwrite public and

private loans for the construction, repair, and operation of affordable housing properties. The mass subsidy termination and eviction caused by the Final Rule and the reduction in the number of assisted households will increase costs and reduce cash flow for these properties, create significant financial instability, and impair their ability to invest in maintenance and capital repairs while also triggering a significant likelihood of foreclosure by lenders. Affordable housing projects that are in development—and are anticipating future project-based commitments—will similarly face unexpected funding gaps.

175. Plaintiff Housing Authorities rely on these private landlords and federally subsidized buildings to supply affordable housing units, and the Final Rule is likely to undermine their ability to ensure a robust supply of affordable housing units in their jurisdictions.

176. In many Plaintiff Localities, which already have extremely high housing costs, the further contraction of the availability of affordable housing units will only exacerbate the existing housing crisis. In Los Angeles, for example, private landlord participation in the HCV program is at an all-time low. A reduction in the number of affordable housing units means that more families with vouchers will not be able to find housing and may remain unhoused or in precarious living situations—which in turn strains Plaintiff Localities' safety-net systems. This harms not just mixed status families, but also fully eligible households who rely on the availability of affordable private units through the HCV program.

177. The Final Rule also undermines the trust between Plaintiff Housing Authorities and mixed status families.

178. Under the Final Rule, Plaintiff Housing Authorities and landlords must send all tenants and applicants a verification consent form stating that housing authorities and landlords "must inform DHS immediately whenever personnel determine that any member of a household

is present in the U.S. in violation of the Immigration and Nationality Act."[61] As discussed further, Part V.A, B, *infra*, that notice requirement is vague and ambiguous and misstates the applicable legal standards. The net result of such a notice will be to create confusion among housing providers and dissuade tenants—even those eligible for benefits—from seeking housing assistance or reporting problems to housing authorities or private landlords.

179. In particular, as HUD notes in the RIA, this notice will have the likely effect of instilling fear in mixed status families and discouraging them from seeking temporary deferral of termination of assistance. Instead, HUD predicts that many families will choose to leave federal housing assistance programs out of fear that their loved ones will be reported to DHS.[62]

### B. Plaintiff Localities Will Face Increased Safety-Net Costs to Meet the Needs of Displaced Families and Address Affordable Housing Disruptions

180. The Final Rule acknowledges that about 78 percent of mixed status families—or approximately 15,500 families—will "likely leave assisted housing together rather than separate."[63] As discussed above, these families are unlikely to be able to locate stable alternative housing in Plaintiff Localities. And because fewer households will receive federal housing assistance under the Final Rule, the net effect of the Rule will be to drastically increase the number of people who go without federal housing assistance and may become housing-insecure or homeless. Indeed, HUD's estimates suggest that significantly fewer individuals will receive financial assistance under the Final Rule.

181. Plaintiff Localities expend significant funds and resources to provide local housing subsidies, transitional housing, permanent supportive housing, temporary shelter, and other services for those experiencing or at risk of homelessness. Mixed status families and

---

[61] Final Rule, *supra* note 38, at 73,027.
[62] RIA, *supra* note 3, at 45.
[63] Final Rule, *supra* note 38, at 73,010.

eligible individuals who are unable to provide adequate documentation for federal housing assistance will increasingly rely on these local systems for shelter and services—at considerable expense to Plaintiff Localities. Critically, many of Plaintiff Localities' housing services programs are already over-subscribed and have long waiting lists. The displacement of mixed status families from federal housing assistance programs will further strain these overburdened local programs, and diverting resources to assist these families means that the Localities will be unable to provide services to dozens of other families facing homelessness in their jurisdictions.

182. San Francisco provides families at risk of homelessness with a variety of housing-related services, including, for example, family temporary shelters, family transitional housing, rapid rehousing subsidies, and permanent supportive housing.[64] Each of those housing options cost the city, on average, between $125 and $250 per night per family, or between approximately $4,000 and $7,500 per month per family. These programs are already overburdened. According to San Francisco's 2026 Point-in-Time count, almost 8,000 people qualified as homeless under HUD's definition.[65] This includes 465 homeless families, including 773 children. As of November 2026, there are currently 347 families on the queue for supportive housing, and approximately 212 families on the waiting list for shelters. In September 2026 alone, 130

---

[64] Transitional housing and rapid rehousing subsidies are both forms of time-limited subsidized housing or rental assistance for eligible households. In rapid rehousing, households sign a lease with a participating landlord and typically pay 30 percent of their income towards rent, with rental assistance paying for the difference; but participation is limited to two years. Similarly, in permanent supportive housing, households sign a lease with a participating landlord and typically pay 30 percent of their income towards rent, with rental assistance paying for the difference. Permanent supportive housing typically has no time limit, and, under HUD guidance, individuals who were previously chronically homeless and living with disabilities are prioritized for permanent supportive housing units.

[65] Point-in-Time counts are conducted annually and physically count each person, sheltered or unsheltered, who qualifies as homeless on a single day. HUD's definition of homelessness captures people who are literally homeless (i.e., living in places not meant for human habitation, including cars, the street, or emergency shelters); people who face imminent risk of homelessness within 14 days (i.e., have impending eviction notices and do not have adequate resources to secure new housing); unaccompanied youth who face housing instability; and individuals escaping domestic violence who lack safe housing or the resources to obtain it.

families joined the family shelter waiting list, and families spend an average of 39 days on the waitlist before being offered a spot in a shelter.

183. San Francisco also funds a local housing subsidy for families experiencing homelessness. The queue for this local housing subsidy is already long, and there is no guarantee that mixed status families would receive such assistance. If the City were to replace federal assistance with local subsidies, it would cost approximately $40,000 per family per year (or more than $8 million annually for 202 mixed status families). In addition, San Francisco funds rental counseling programs for households seeking rental housing in San Francisco, which costs approximately $1,000 per household. This program will face significant burdens assisting the more than 200 mixed status families who will need to seek alternative rental accommodations after losing federal housing assistance.

184. In Boston, the Mayor's Office of Housing (MOH) provides services for families facing housing insecurity. From January 1, 2022, through December 31, 2025, 6,438 families struggling with housing instability received services including legal and rental assistance, eviction prevention mediation, and housing search support through City initiatives. MOH's Supportive Housing Division also works with community partners to administer shelter programs and supportive housing for Bostonians living in emergency shelters, experiencing unsheltered homelessness, or fleeing domestic violence. In 2025, the Division funded 1,373 households in permanent supportive housing; 462 households in rapid rehousing; 41 households in transitional housing; and 559 households in home set-aside units. MOH's Housing Compliance and Asset Management (HCAM) division also oversees a portfolio of almost 20,000 locally funded, income-restricted units.

185. The demand for affordable housing is high—so far in 2026, HCAM conducted 29 housing lotteries for 505 units, with 41,477 households applying for spots. According to Boston's 2025 Point-in-Time count, there were 2,574 homeless households in Boston. In June 2026, there were approximately 1,561 individuals on the Supportive Housing Division's waitlist queue. As of early November, there were approximately 51 housing vacancy requests for waitlist referrals, and each vacancy request has at least one client already matched to the housing opportunity for screening. The displacement of more than 500 mixed status families from BHA-supported federal housing assistance programs will put a significant strain on Boston's housing programs.

186. In order to mitigate the immediate stress on state and local shelter and safety-net systems, BHA has announced its intent to use its reserves in the Boston City Voucher Program, which is funded by the City of Boston, as a last resort to provide bridge assistance to affected families. The reserves in this program are limited and cannot absorb the needs of the more than 500 families who will lose federal assistance under the Final Rule, and BHA anticipates that this assistance would only last for a few months.

187. In FY 2026, New York City spent $156.37 per day for a single adult in shelter (approximately $57,075 per year); $244.87 per day for adult families in shelter (approximately $89,378 per year); and $277.01 per day for families with children in shelter (approximately $101,109 per year). Accordingly, the Final Rule will likely impose significant costs on New York City to provide shelter to those mixed status households who cannot find alternate housing.

188. LA City will be forced to shoulder significant costs to prevent thousands of mixed status families from being evicted and falling into homelessness. Specifically, LA City estimates an immediate annual cost to the city of more than $84 million to keep currently assisted mixed

status families housed. If LA City is unable to fund the $84 million necessary to replace the terminated federal subsidies, its safety net and emergency shelter resources will be overwhelmed by the wave of evictions. If mixed status families make the difficult decision to separate to preserve their housing assistance, an estimated 2,400 ineligible family members will require immediate shelter. If families refuse to separate and are evicted together, up to 7,400 individuals will need emergency interim housing beds—which could cost LA City nearly $300 million in the first year alone. The hundreds of millions of dollars in direct shelter costs do not capture the massive, uncompensated collateral burdens the Final Rule will place on LA City's local municipal infrastructure by significantly reducing available funding for police and fire protection, street maintenance operations, municipal trash pickup, and other city services.

189. The LA County Department of Homeless Services and Housing ("HSH") leads a unified countywide response to homelessness that combines housing, health, and social services. For those mixed status families who lose housing stability due to the Final Rule, LA County HSH anticipates increased demand for emergency rental assistance and short term rent subsidies to cover the gap after a termination of federal housing assistance; diversion and flexible financial assistance programs to prevent homelessness and keep people out of the homelessness system; locally funded interim and permanent housing subsidies for families who face homelessness; and an increased burden on staff to help families connect with services and programs.

190. LA County's HSH already faces a shortage of available resources to meet the needs of all people experiencing homelessness in the county. Its interim housing beds are full, its family services are oversubscribed, and the need for permanent housing solutions vastly outpaces availability. According to the 2026 Point-in-Time count, there are an estimated 73,040

individuals experiencing homelessness in LA County. The Final Rule will only exacerbate the homelessness crisis in the county.

191. Chicago also has a shortage of affordable housing units for mixed status families who lose their federal housing assistance. In 2023, there were only 24 affordable and available units for every 100 extremely-low income households in Chicago (a deficit of over 100,000 units). As of January 2026, there were more than 6,500 people experiencing homelessness in Chicago. The Chicago Department of Family and Support Services operates a short-term rental assistance and case management program that provides up to six months of rent for families facing homelessness; emergency shelters and 24/7 crisis response programs; street-outreach teams to assist unsheltered people; drop-in centers offering basic services like laundry, showers, and food; and housing supports, including rapid re-housing, supportive services attached to permanent housing for youth, families, veterans, and single adults, flexible housing pool subsidies, and funding for youth transitional housing. In total, Chicago distributed more than $340 million to homelessness-related programs in FY 2025. The loss of housing assistance for mixed status families will increase demand for these programs and further strain Chicago's resources.

192. Seattle operates City-funded homelessness prevention and housing stability services, including a program that provides resident services, case management, and rental assistance for households at or below 50 percent of the area median income. The City's shelter costs vary depending on the services and specialized care each location provides. On the lowest end, Seattle spends about $25,000 per year to fund one emergency shelter bed, including meals. If every mixed status household served by the Seattle Housing Authority must leave their subsidized units and seek emergency shelter for even one month, the cost to the City would be

more than $4,150 per month for a two-person family and more than $8,300 per month for a family of four.

193. King County and its partners and delegates operate a wide variety of essential public programs to keep residents healthy, safe, housed, employed, and educated. One example is Best Starts, a voter-approved comprehensive support program that provides a variety of services to children born or residing in the county. Best Starts operates a youth and family homelessness prevention program that has supported approximately 2,000 King County families since its inception, with an average service group of 300 families at any given time. Best Starts and other homelessness programs will have insufficient funds to serve all of the mixed status households—including the many U.S. citizen children residing in those households—who will no longer have access to federal housing assistance under the Final Rule.

194. Similarly, San Diego supports a variety of homelessness programs, including shelters, safe sleeping sites, and services to help connect homeless families to permanent housing. San Diego has invested heavily in expanding shelter options. However, there are almost 6,000 people experiencing homelessness in San Diego. The loss of housing assistance for mixed status families would increase demands for San Diego's homelessness prevention programs, shelters, and services, as families seek relocation, emergency rent support, temporary housing, and shelter referrals.

195. In Santa Clara County, the Office of Supportive Housing ("OSH") has a partnership with the Santa Clara County Housing Authority ("SCCHA"), where the SCCHA has dedicated more than 2,000 housing choice vouchers towards individuals and families who were chronically homeless, who have disabilities, and/or who were previously living in institutionalized settings. These households are served by Santa Clara's permanent supportive

housing system, with their rental assistance provided by the voucher. Santa Clara's OSH is responsible for assisting households referred to these programs to obtain all necessary documentation, including documentation affected by the Final Rule. Thus, Santa Clara will have immediate implementation costs to assist the hundreds of individuals (including mixed status families, children, and seniors) who must now provide documentation of eligibility under the Final Rule, as well as for any additional affected individuals and households who are in the queue for these programs. Santa Clara will immediately need to train staff on the Final Rule's changes, and the changes in the Rule will increase workloads of staff who will need to counsel affected households on the changes and assist them with gathering newly required documentation. Due to unprecedented budget challenges from federal and state funding cuts, it is not possible for Santa Clara's OSH to hire additional staff to support the additional work of assisting households due to the new requirements. Additionally, it would not be possible for Santa Clara's OSH to divert other staff or resources towards this additional work without negative consequences to other homeless programs.

196. For households and individuals in this Santa Clara permanent supportive housing program who lose their vouchers or separate from their families because of the Final Rule, there are limited alternative resources to place them in permanent supportive housing, as the demand already far exceeds the supply. These households are at the greatest risk of returning to homelessness if they lose their vouchers because of their history of chronic homelessness and disabling conditions. Santa Clara anticipates that a large number of these affected households will become homeless, straining Santa Clara's shelters and temporary housing networks, which already have long wait lists.

197. In recent years, Santa Clara's OSH has made great strides to reduce the number of homeless families with children by expanding family shelter beds and investing in other interventions. Santa Clara invests over $13.5 million annually to operate nearly 700 family shelter beds. However, as of November 2026, there are more than 500 families on the shelter waiting list with an average wait time of over two months. This waiting list will undoubtedly grow as a result of the Final Rule as mixed status families who are displaced from federal housing assistance will be unable to afford market rate rents in the county.[66]

198. Santa Clara also operates a locally funded homelessness prevention program, which includes time-limited financial assistance in addition to case management and connection to other services. The budgeted cost of assisting a single household through the county's homelessness prevention program is $15,000, although individual cases vary. While the program is highly effective in helping households remain stably housed, demand for this assistance already greatly exceeds capacity. The additional number of households in the region who will be facing eviction due to the Final Rule will create even greater need for this homelessness prevention program.

199. Several of Plaintiff Localities, including San Francisco, Santa Clara, LA City, and Seattle, award grants to community organizations that provide tenants with eviction defense services. The Final Rule will likely result in a higher volume of requests for assistance from mixed status families.

[66] There are no other permanent housing assistance programs in Santa Clara County that can assist households that will likely lose their assistance due to the Final Rule. The other permanent housing assistance programs currently administered by the county require households to meet HUD's definition of "homeless" at the time of enrollment, and current mixed status families will not qualify at the time they lose their voucher—they would have to first become homeless to qualify.

200. The Final Rule will also require Plaintiff Localities to make programmatic changes in the services they provide to address housing insecurity in their jurisdictions. Because the Final Rule will likely displace hundreds of mixed status families in a short period of time, Plaintiff Localities will have to shift resources from early intervention to crisis response to meet the immediate needs of displaced mixed status families—undermining their ability to address the needs of other residents and reducing the efficacy of overall homelessness prevention efforts.

201. For example, LA City's Community Investment Department ("CID") currently funds a wide range of community development programs, including neighborhood improvements, economic development services, affordable housing, and housing security interventions, which are separate from the emergency interim housing beds described in paragraph 188, *supra*. The alteration of HUD's eligibility rules to eliminate public housing and Section 8 enrollment for mixed status families will disrupt the balance of services CID provides to its residents. Displacing more than 1,800 families will force CID to shift their limited staff and funding away from its upward-mobility services and redirect them toward the housing security interventions, including emergency rental assistance, immediate eviction prevention, shelter placements, and crisis intervention. City-funded programs that provide meals to seniors, local job training, youth tutoring, career development, free tax preparation, financial literacy training, and domestic violence response services will all be disrupted by the need to divert resources toward the thousands of newly displaced families.

202. Even with shifting all funding away from CID's upward-mobility services, the department's rental assistance program will be unable to meet the monthly rental payment gaps that will result from HUD's displacement of more than 1,800 mixed-status families. LA City will be called upon to provide rental assistance to any or all of those displaced. Such rental assistance

could cost the City $1,000 to $2,000 per household per month, or up to $1.8–$3.6 million per month ($21.6–$ 43.2 million for a single year) for all displaced mixed-status families. At the top end, that demand would well exceed available funding, amounting to more than 50 percent of CID's annual budget, including all staff salary and operational costs

203. The increase in homelessness and housing instability caused by the Final Rule will also impact Plaintiff Localities' local healthcare systems.

204. As discussed above, mixed status families forced into homelessness and housing instability are at heightened risk of myriad adverse health and safety impacts. HUD acknowledges that the "[t]he costs of homelessness to local governments can be substantial," and includes not only the immediate cost of providing shelter, but also "emergency services and health care."[67] Indeed, the U.S. Department of Health and Human Services notes that homelessness and housing insecurity can "negatively affect physical health and make it harder to access healthcare," and that children are particularly vulnerable to adverse health impacts from housing instability.[68]

205. Many Plaintiff Localities fund safety-net health services. For example, under California state law, Santa Clara and San Francisco are responsible for administering the social safety net and providing services to meet the basic needs of vulnerable residents in their jurisdictions. Santa Clara and San Francisco both operate public safety-net healthcare systems that provide care regardless of income or ability to pay. San Francisco and Santa Clara expect to see increased burdens on their healthcare programs, including emergency healthcare services, from mixed status families who are displaced by the Final Rule. As discussed above, those

[67] RIA, *supra* note 3, at 35.
[68] U.S. Dep't of Health & Hum. Servs., Off. of Disease Prevention & Health Promotion, Housing Instability, Healthy People 2030, https://odphp.health.gov/healthypeople/priority-areas/social-determinants-health/literature-summaries/housing-instability (last visited Oct. 27, 2026).

families who face homelessness and housing insecurity as a result of losing federal housing assistance are at risk for numerous concomitant adverse health impacts. But even where mixed status families are able to find alternative housing, they will be severely rent-burdened and are more likely to delay seeking preventative care and wait to seek care until they encounter more serious—and more costly—health emergencies. Because these families are low income and have limited resources to pay for care, particularly where they are required to devote a significant share of income to rent, there is also likely to be an increase in uncompensated care costs borne by Plaintiff Localities.

206. In New York City, without Section 8 housing, some mixed status families may be forced to turn to the City's shelter system. Evidence and clinical experience demonstrate that removing families from Section 8 housing will be damaging to their health and to public health more broadly. For example, disrupting housing stability risks disrupting health care delivery, including patients' ability to keep scheduled visits. This can be harmful for individuals, but also problematic for New York City's efforts to provide care for and control communicable diseases, such as those treated in the City's Health Department sexual health clinics and tuberculosis clinics.

207. The City of Chicago provides public health resources to homeless encampments and shelters. Mixed status families in Chicago who lose their housing as a result of the Final Rule are likely to become reliant on the City's shelter-based healthcare programs and may be at greater risk of emergency room visits. Chicago's Fire Department provides emergency ambulance transportation services to residents, regardless of income and insurance status. During the first quarter of 2026, the average gross charge for ambulance rides was $3,387.33 and the average net charge was $2,004.24. Between September 1, 2025, through March 31, 2026, the

City provided more than 33,000 ambulance transports for Chicago residents for whom no insurance has been identified, costing more than $118 million. Thus, even a slight increase in the number of emergency transports needed for uninsured individuals at greater risk of emergency room visits will place significant added financial burdens on the City.

208. Under Washington State law and regulations, Public Health – Seattle & King County ("PHSKC") is required to provide healthcare services to all at its health centers, including medical and dental care. PHSKC provides medical outreach services for people experiencing homelessness; has teams of nurses and social workers who address the health and social needs of children experiencing homelessness; and operates over ten public health centers, including four in Seattle. Citing CDC resources, King County recognizes that "people experiencing homelessness have a higher burden of illness, including chronic disease, infectious disease and behavioral health conditions, than the general population."[69] An increase in housing instability will result in an increase in uncompensated care, and PHSKC anticipates needing to bear the cost of providing additional care.

209. In Providence, families who face homelessness or are severely rent burdened after losing federal housing assistance will likely experience food insecurity and have reduced access to preventative and primary care. These families will become increasingly reliant on the city's Child and Adult Food Care Program, and will create a strain on Providence's emergency medical services, which are often provided through the Providence Fire Department's EMTs.

210. HUD acknowledges that the various costs to local governments to provide care for families experiencing homelessness—including "transitional shelters and community

---

[69] Pub. Health – Seattle & King Cnty., *Public Health's Role at the Intersection of Health and Homelessness,* King Cnty., Wash., https://kingcounty.gov/en/dept/dph/health-safety/health-centers-programs-services/health-services-for-the-homeless/intersection-health-homelessness (last visited Nov. 19, 2026).

support, emergency services and healthcare, and interaction with the criminal justice" system—are substantial, with some studies estimating the costs associated with homelessness between $20,000 and $50,000 per year.[70] HUD also cites to a Cost of Eviction calculator, which estimates that the cost to local governments of evicting one household is over $11,000, based on the evicted household's increased use of emergency shelters, emergency room services, inpatient hospital services, foster care services, and juvenile delinquency services.[71]

211. Under even the most conservative estimates cited in HUD's RIA, many Plaintiff Localities are likely to see millions of dollars of increased costs to provide services to families displaced by the Final Rule. For example, for 202 mixed status families in San Francisco, the Cost of Eviction calculator HUD cites projects increased costs of over $3 million even if only 25 percent of these families become homeless. As discussed above, the overall costs are in fact likely to be significantly higher for many Plaintiff Localities.

212. The broader disruption to local affordable housing markets, discussed in Part III.B and IV.A *supra*, will also harm Plaintiff Localities, many of which have made significant investments in supporting the development of affordable housing. For example, San Francisco provides financial assistance to project-based HCV properties in the form of long-term loans. The expected decline in the number of households receiving federal assistance will, in turn, reduce the revenue to project-based affordable housing property owners and will thereby impair these property owners' ability to repay loans to San Francisco.

213. Seattle also helps fund buildings where Section 8 housing program vouchers, including HCV and PBV, are used and accepted. If mixed status families living in City-funded housing programs lose their federally funded vouchers, the organizations providing this housing

[70] RIA, *supra* note 3, at 35.
[71] *Id.* at 36.

will likely seek payments from the City to make up for the lost subsidies. The City's cost for providing gap-filling rental assistance for one family for a year would be greater than $31,000 per year for a four-person household.

## V. The Final Rule Is Unlawful

### A. The Final Rule Contravenes Section 214

214. By terminating prorated financial assistance for mixed status families, the Final Rule violates the plain language of Section 214.

215. Section 214(b)(2) states unequivocally that, for families where at least one member has affirmatively established eligibility, financial assistance "shall be prorated" based on the number of eligible family members compared to the total number of family members.

216. HUD's new proffered reading of Section 214—i.e., that it only requires prorated assistance for the short duration when the eligibility status of certain family members is still pending—has no basis in the statute.

217. Section 214(b)(2)'s mandatory directive to provide prorated assistance contains no time limitation. By contrast, Congress explicitly included a time limit in other subsections of Section 214 that deal with preserving assistance for certain groups. For example, for families receiving assistance on February 5, 1988 whose assistance is to be terminated, Section 214(c) allows housing authorities to permit continued assistance or defer termination of assistance "for a 6-month period" that may be renewed "for an aggregate period of 18 months."[72]

218. In the Final Rule, HUD highlights language in Section 214(d)(2), which states that HUD may not provide assistance "for the benefit of" an individual applying for housing assistance "before documentation is presented and verified." HUD asserts that this provision

[72] 42 U.S.C. § 1436a(c)(1), (c)(1)(B)(ii).

requires that all members of a household be verified and that prorated assistance for a mixed status family impermissibly provides assistance for the benefit of ineligible individuals in the household.[73]

219. However, under Section 214(b)(2) and the current, longstanding regulations, prorated assistance is provided only based on the number of eligible members of the household. Ineligible members are required to pay their full share of the rent and do not receive a federal subsidy. For example, in a mixed status family participating in the HCV program, while eligible members of the family receive subsidies, ineligible members have to pay their full share of rent.

220. HUD also reads the language in Section 214(d)(2) out of context. The sentence in Section 214(d)(2) that HUD quotes from refers specifically to "an individual *applying for financial assistance*" and limits HUD's ability to provide assistance "for the benefit *of that individual*" unless they provide certain documentation. But individuals who do not contend eligibility are not applying for financial assistance and are in fact specifically excluded when calculating prorated assistance for a household. Indeed, Section 214(b)(2) specifically defines "financial assistance" to take into account prorated assistance to mixed status families.

221. Section 214(d)(2) also deals specifically with documentation requirements for individuals who have submitted declarations stating that they are not citizens, have eligible immigration status, and are under 62 years of age. It does not purport to impose a requirement that *all* tenants and applicants must affirmatively establish eligibility.

222. Moreover, Section 214(d)(6) states that although HUD may terminate financial assistance if an individual knowingly permits an ineligible person to reside in a federally subsidized unit, this penalty "shall not apply to a family if the ineligibility of the ineligible

[73] 42 U.S.C. § 1436a(d)(6); *see also* Final Rule, *supra* note 38, at 73,014.

individual at issue was considered in calculating any proration of assistance provided for the family."[74]

223. In other words, Congress clearly contemplated that mixed status families would lawfully continue to receive prorated assistance even after an individual's failure to affirmatively establish eligibility was "considered," and that prorated financial assistance received by eligible members of mixed status families would not constitute impermissible receipt of funding "for the benefit of" ineligible members of the family.

224. The Final Rule therefore requires public housing authorities to terminate housing assistance in circumstances where Section 214 plainly permits such assistance to be provided.

225. The Final Rule is also anathema to decades of consistent Congressional intent and HUD regulatory interpretations. *See* Part I, *supra.*

226. The Congressional history of the 1988 Amendments to Section 214 demonstrates Congress's intent to protect the sanctity of families and its rejection of HUD's 1986 Rule, which, like the Final Rule, required all household members to demonstrate proof of eligibility.

227. After HUD's 1995 Rule—which authorized indefinite prorated assistance to mixed status families—Congress ratified prorated assistance in the 1996 Amendments. The language HUD points to in Section 214(d)(2) was added in 1996, against the background of the 1995 Rule's prorated assistance scheme. Yet in enacting this language, Congress did not undo proration, but instead confirmed proration of assistance in Section 214(b)(2), which was added at the same time. In the ensuing 30 years, neither Congress nor HUD has understood "for the benefit of" to preclude prorated assistance to mixed status families. And despite decades of non-time-limited prorated assistance, Congress has not changed the language of Section 214.

[74] 42 U.S.C. § 1436a(d)(6).

228. The Final Rule's verification and reporting requirements also exceed the authority provided by Section 214.

229. Section 214 does not authorize the use of the SAVE system to verify the *citizenship* status of U.S. citizens or nationals. Instead, Section 214(d) specifically only authorizes the use of an "automated system," such as SAVE, to verify the *eligible immigration status* of eligible noncitizens under 62 years of age. For individuals who attest that they are U.S. citizens, Section 214(d)(1)(A) only contemplates that the HUD Secretary or housing authority may request certain documents, such as a passport or social security card.[75]

230. Section 214 does not authorize HUD to require noncitizens 62 years and older to submit to SAVE verification or produce documentary proof of eligibility. The statute lays out eligibility verification requirements for individuals who attest that they are eligible noncitizens—including the use of SAVE and production of documentation—but expressly limits these requirements to individuals who are "not 62 years of age or older."[76] Pursuant to the statute and HUD regulations, eligible noncitizen seniors 62 years and older are only required to submit a declaration under penalty of perjury and proof of age.

231. Section 214 likewise does not authorize HUD to require families to "immediately notify and submit evidence of the new citizenship or eligible immigration status to the responsible entity" if a family member's "citizenship or eligible immigration status changes during occupancy."[77] Pursuant to the statute, once the "eligibility for financial assistance of at least one member of a family has been affirmatively established," that financial assistance "shall

[75] *See* 42 U.S.C. § 1436a(d)(1)(A), (d)(2)–(3).
[76] 42 U.S.C. § 1436a(d)(2); *see also id.* § 1436a(d)(1)(A) ("If the declaration states that the individual is not a citizen or national of the United States and that the individual is *younger than 62 years of age*, the declaration shall be verified by the Immigration and Naturalization Service.") (emphasis added); 24 C.F.R. § 5.508(b)(2).
[77] Final Rule, *supra* note 38, at 73,027.

be prorated."[78] And under current HUD regulations, a family member is "required to submit evidence of eligible status *only one time* during continuously assisted occupancy under any Section 214 covered program."[79] Despite HUD reiterating that "the evidence requirement is a one-time obligation,"[80] the Final Rule creates an unauthorized continuing obligation that places heightened burdens on mixed status families and public housing authorities to conduct an eligibility verification process multiple times, despite already complying with statutory requirements.

232. The Final Rule's elimination of the existing appeals process also contravenes Section 214.

233. HUD relies on the federal government's use of SAVE as justification for its removal of 24 C.F.R. § 5.514(e), which details the process for an individual to appeal the results of an adverse eligibility determination and specifically provides that "[p]ending the completion of the [USCIS] appeal under this section, assistance may not be delayed, denied, reduced, or terminated on the basis of immigration statute."

234. But HUD cannot remove a statutory right to an appeal through regulatory action. 24 C.F.R. § 5.514(e) implements provisions of Section 214 that provide, for example, that where a person's eligible immigration status has not been verified, HUD "shall provide a reasonable opportunity, not to exceed 30 days, . . . to appeal to the [USCIS] the verification determination of the [USCIS]."[81] Section 214 further provides that, "pending such verification or appeal, [HUD]

[78] 42 U.S.C. § 1436a(b)(2).
[79] 24 C.F.R. § 5.508(f)(5) (emphasis added).
[80] Final Rule, *supra* note 38, at 73,022.
[81] 42 U.S.C. § 1436a(d)(4)(A)(i); 24 C.F.R. § 5.514(e).

may not … deny the application for such assistance on the basis of the immigration status of that individual."[82]

235. HUD justifies removing this appeals provision by stating it is "[r]emoving the outdated INS-appeal machinery" to "reflect[] the shift to SAVE while preserving an informal-hearing right."[83] HUD asserts that the appeals process is "outdated," "reflects procedures that existed before the SAVE program was utilized by HUD, and does not account for U.S. citizenship verification."[84] But, as noted above, the statute is not outdated—it authorizes the use of an "automated or other system" designated by DHS (such as SAVE) to verify the immigration status of eligible noncitizens younger than 62.[85] And even if SAVE does make some of the existing paper-based appeals process outdated, that cannot justify removing the appeals process because, as HUD acknowledges, "SAVE does not offer an appeal process."[86] The Final Rule's offer that "individuals may seek a records correction with any agency that issued or maintains a record or document relevant to a person's verification of eligible status"[87] as part of an "informal-hearing right"[88] does not afford the statutorily required appeals rights.

236. Finally, the Final Rule's requirement (reflected in the verification consent form) that housing authorities and private owners "must report to DHS immediately whenever personnel determine that any member of a household is present in the U.S." unlawfully misstates the applicable legal requirements.

---

[82] 42 U.S.C. § 1436a(d)(4)(B)(ii)(II).
[83] Final Rule, *supra* note 38, at 73,015.
[84] *Id.; see also Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. at 8160 (proposed rule).
[85] 42 U.S.C. § 1436a(d)(3).
[86] *Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. at 8160 (proposed rule).
[87] Final Rule, *supra* note 38, at 72,979; *see also Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. at 8160 (proposed rule).
[88] Final Rule, *supra note* 38*,* at 73,015.

237. Under Section 404 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), housing authorities must report to DHS if they "know" that an individual is in the country unlawfully.[89] Through guidance issued in 2000 (the "2000 Interagency Notice"), HUD has construed PRWORA's reporting requirement narrowly as only requiring housing authorities to report if there is a "finding of fact or conclusion of law" that an individual is present in the United States unlawfully and that finding or conclusion is supported by a determination by the federal government, such as a Final Order of Deportation.[90] HUD specifically stated in that notice that a SAVE response showing that an individual is ineligible for a benefit is not a finding of fact or conclusion of law that the individual is not lawfully present in the United States.[91]

238. In the Final Rule, HUD acknowledges that the 2000 Interagency Notice continues to govern when housing authorities must report someone's unlawful presence.[92]

239. The new verification consent form, however, uses broader language and suggests that both housing authorities and landlords must "immediately" report anyone that they "determine" is unlawfully present—an apparent departure from the "knowing" requirement.[93]

240. In addition, while Section 404 of PRWORA imposes an obligation on HUD and public housing authorities to report individuals known to be in the United States unlawfully, the

---

[89] *See* 42 U.S.C. § 1437y.
[90] *Responsibility of Certain Entities to Notify the Immigration and Naturalization Service of Any Alien Who the Entity "Knows" Is Not Lawfully Present in the United States,* 65 Fed. Reg. 58,301, 58,302 (Sept. 28, 2000) [hereinafter *2000 Interagency Notice*]. While the U.S. Department of Justice Office of Legal Counsel has issued a memorandum that appears to disagree with the 2000 Interagency Notice, HUD has not rescinded the applicable notice or altered its interpretation of the PRWORA reporting requirement.
[91] *Id.* at 58,302.
[92] See Final Rule, *supra* note 38, at 72,979.
[93] *See id.*

statute imposes no such requirement on private property owners, such as private landlords participating in HCV and PBRA programs.

241. Further, PRWORA only requires HUD and housing authorities to report to DHS "at least four times annually and upon request of" DHS. HUD's longstanding guidance similarly specifies reporting four times a year.[94] The statute does not contemplate a continuous, "immediate" reporting obligation such as HUD seeks to impose through the Final Rule.

242. Finally, HUD cites to Executive Order 14,218 as authority for the Final Rule.[95] However, an Executive Order cannot authorize agency action contrary to the requirements of Section 214 and PRWORA.

243. In any event, Executive Order 14,218 only requires that public benefits not go to ineligible immigrants.[96] Section 214 already makes clear that assistance to mixed status families is prorated such that ineligible members of the family do not receive assistance. As such, Executive Order 14,218 does not provide authority for the Final Rule.

**B. The Final Rule Is Arbitrary and Capricious**

244. The Final Rule is also arbitrary and capricious for myriad reasons.

245. HUD fails to articulate a reasoned explanation for the Final Rule's effective elimination of prorated assistance, particularly where the Rule departs from HUD's decades-long regulations permitting prorated assistance.

246. HUD asserts that the Final Rule is necessary to align with the language of Section 214. Indeed, throughout the Final Rule, HUD's primary response for the myriad adverse impacts outlined by commenters is that these costs and harms are justified because the Final Rule is

---

[94] 42 U.S.C. § 1437y.
[95] *See* Final Rule, *supra note* 38, at 72,985.
[96] *See* Exec. Order No. 14,218, 90 Fed. Reg. 10,581.

necessitated by Section 214. For example, HUD recognizes that the rule will harm mixed status families, including children residing in those families; push many families towards housing insecurity and homelessness; put families and children at risk of adverse physical and psychological health impacts; impose significant administrative burdens on housing authorities; and shift costs to municipal safety-net systems. Yet HUD discounts these costs because it insists that this outcome is required by Section 214(d)(2).[97]

247. However, as discussed above, *see* Part V.A, *supra*, the Final Rule is inconsistent with the plain language of Section 214. Nor can it be reconciled with the legislative history of that provision. Because the Final Rule in fact exceeds HUD's authority under Section 214, the agency's explanation for dismissing the harms caused by the Final Rule is unreasonable and arbitrary.

248. HUD asserts that the Final Rule is necessary so that federal assistance is not made available to any ineligible immigrants. However, under Section 214 and longstanding HUD regulations, individuals without eligible immigration status are taken into account when prorating assistance for mixed status families. Prorating ensures that eligible family members receive federal assistance and ineligible family members do not. It is therefore factually inaccurate that federal financial assistance is provided to ineligible individuals.

---

[97] *See, e.g.,* Final Rule, *supra* note 38, at 73,000 (determining that the rule "appropriately balances" the interests and harms of affected parties and responsible entities "while furthering compliance with applicable statutory requirements and advancing the Department's policy objectives"); *id.* at 72,991 ("HUD maintains that the 'do not contend' option is inconsistent with Section 214."); *id.* at 73,006 (discounting "contributions to the workforce" because "Section 214 clearly prohibits HUD from making certain this financial assistance available to persons other than United States citizens or specified categories of eligible noncitizens"); *id.* at 73,010 (overriding the admittedly "genuine and serious concern" regarding "impact this rule will have on children" because "[t]his outcome follows from Section 214(d)(2)"); *id.* at 73,015 (rejecting regulatory alternatives because "HUD now reads Section 214 to require verification of all members and to treat proration as temporary"); *id.* at 73,016 (stating that "reliance interests, however substantial, cannot override HUD's determination of what Section 214 itself permits").

249. HUD asserts that the primary benefit of the rule is to allow the agency to "reprioritize rental assistance for households with eligible citizenship or immigration status as required by law."[98] Yet HUD's own analysis suggests that 31,000 fewer *eligible* individuals will receive federal housing assistance under the Final Rule than under the current regulations.[99]

250. The evidence before HUD also fails to support the agency's view that making assistance available to mixed status families has a significant impact on the availability of assistance for eligible individuals. By HUD's own calculation, of the nearly 80,000 individuals in mixed status families currently receiving federal housing assistance, only 24,100 have ineligible status.[100] These ineligible individuals comprise less than one third of one percent of the 8.8 million people nationwide that participate in federal housing assistance programs.[101]

251. In the Proposed Rule and RIA, HUD makes other unsupported assertions about the need for the rule.

252. HUD asserts that the rule is necessary to "align with the current Administration's priorities."[102] Yet the Executive Branch's policy priorities do not provide a rational basis for contradicting statutory requirements or dismissing the myriad harmful effects of the Final Rule.

253. HUD claims that housing assistance creates "negative incentives" for unauthorized immigrants, including "work disincentives."[103] But as HUD acknowledges, mixed status families with ineligible members have, on average, higher incomes than fully eligible

[98] *Id.* at 72,995.
[99] RIA, *supra* note 3, at 17.
[100] *Id.* at 9.
[101] *Id.*
[102] *Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. at 8153 (proposed rule).
[103] RIA, *supra* note 3, at 13.

households, and the number of mixed status households receiving housing assistance has declined—even as unlawful immigration to the United States has increased.[104]

254. HUD similarly asserts in the RIA that households with all eligible members would be "better positioned to take advantage of" the enhanced mobility, safety, and economic opportunity provided by housing assistance.[105] HUD's assertion is entirely unsupported, and, in any event, the vast majority of individuals who will be deprived of federal housing assistance or forced to separate by the Final Rule are U.S. citizens and eligible noncitizens.

255. Despite commenters highlighting the lack of support for these statements, HUD does not substantiate these assertions in its Final Rule.[106]

256. HUD also relies on Executive Order 14,218 as a basis for the Final Rule. But reliance on an Executive Order does not excuse an agency from its obligation to make a reasoned decision. An Executive Order also does not provide authority for adopting a rule that is inconsistent with statutory authority, as discussed above.

257. Similarly, HUD does not adequately explain its decision to impose onerous verification and documentation requirements, including requiring the use of SAVE for U.S. citizens and requiring noncitizens 62 years and older to submit to SAVE verification and provide documentary proof of eligibility.

258. Section 214 and HUD's longstanding regulations lay out detailed mechanisms to establish eligibility for housing assistance. HUD provides no evidence that these mechanisms have been inadequate to ensure that only U.S. citizens and eligible noncitizens receive federal housing assistance.

---

[104] *Id.* at 10, 36.
[105] *Id.* at 12.
[106] *See* Final Rule, *supra* note 38, at 73,019.

259. HUD in fact believes that it is appropriate to assume that "there are relatively few noncitizens who falsely declare citizenship under its current rules."[107]

260. HUD provides no satisfactory explanation for why a Final Rule that will result in fewer households and fewer eligible individuals receiving housing assistance and will disrupt the availability of affordable housing units is consistent with HUD's mission or the purpose of federal housing assistance programs.

261. In particular, HUD fails to explain how the Final Rule is consistent with its obligations under the Fair Housing Act to administer its programs to further fair housing. *See* 42 U.S.C. § 3608(e)(5). As discussed above, the Final Rule will likely result in fewer households receiving housing assistance. And HUD acknowledges that the Final Rule will pose a "particular hardship" for protected groups, including Latino, Black, Asian American Pacific Islander, and disabled tenants and applicants.[108] Yet, HUD dismissed these concerns without providing a reasoned explanation.

262. HUD also fails to take into account significant reliance interests implicated by the Final Rule.

263. HUD fails to adequately consider the reliance interests of mixed status families—including the 55,100 eligible adults and children residing in those households—who would no longer be able to live together in federally subsidized housing. Similarly, the Final Rule does not account for the reliance interests of those individuals, like noncitizen seniors 62 years and older, who have previously not been required to provide documentation and may be unable to satisfy the Final Rule's onerous new requirements. Many of these individuals and families have relied

[107] *Housing and Community Development Act of 1980: Verification of Eligible Status,* 91 Fed. Reg. at 8152 n.14 (proposed rule).
[108] Final Rule, *supra* note 38, at 73,011.

on the availability of a stable, subsidized housing unit in making critical life decisions, including about jobs, schools for their children, financial planning, and healthcare. For example, mixed status families receiving assistance through BHA, Fresno Housing, and HACSB have received assistance for over eight years on average.

264. In addition, HUD fails to consider the reliance interest of housing authorities, who have structured their budgets and operations for over thirty years based on the provision of prorated assistance to mixed status households; private landlords, who have relied on vouchers as a reliable source of income; and local governments, who operate or have made investments in affordable housing units in reliance on the existing regulations.

265. HUD ignores that the likely effect of the Final Rule will be to strain localities' social safety net functions, including shelter and temporary housing, healthcare, costs to support evictions, and other support services. Multiple commenters noted that the "rule externalizes federal housing costs onto state and local governments without reimbursement."[109] In response, HUD acknowledges that "displacement can shift costs to municipalities and emergency systems" and that "the costs of homelessness to local governments—arising from transitional shelter, community support, emergency services, health care, and interaction with the criminal justice system—can be substantial, with studies estimating $20,000 to $50,000 per person per year."[110] Yet HUD speculates that these costs may be partially offset "to the extent displaced individuals leave the United States" or if fully eligible families on waitlists can now receive assistance (albeit fewer families total with the same federal assistance).[111] HUD goes on to assert that it

[109] Final Rule, *supra* note 38, at 73,000.
[110] *Id.* at 73,001.
[111] *Id.*

"does address homelessness and local-government costs" in the RIA but that "the net effect is expressly treated as ambiguous."[112]

266. HUD's basis for dismissing the effects of the Final Rule on homelessness and local social safety-net systems as ambiguous runs counter to the evidence.

267. HUD's assertion that costs to localities will be offset because mixed status families will leave the United States has little basis in fact, especially where HUD's estimates show that 70 percent of members of mixed status households have eligible immigration status or U.S. citizenship. Contrary to HUD's speculation, many of these families are longstanding residents of, and have durable economic, familial, and community ties to, Plaintiff Localities.

268. Nor is it likely that the increased costs on Plaintiff Localities will be offset by fully eligible households gaining access to federal housing assistance withdrawn from mixed status families. Commenters highlighted the fact that mixed status families lack the resources to afford stable housing in many localities, particularly in many Plaintiff Localities that have significant mixed status families but also have some of the highest housing costs in the country and low rental vacancy rates.[113] HUD acknowledges that a household's ability to pay full rent, the availability and affordability of alternative housing, and local market conditions affect whether a family will become homeless,[114] and admits that families in these markets would face "significant difficulty securing alternate housing."[115] And HUD estimates that there will be more mixed status families displaced from federal housing assistance than there will be eligible families who enter housing.[116]

---

[112] *Id.* at 73,000.
[113] *Id.* at 73,004-05.
[114] *Id.* at 72,996.
[115] *Id.* at 73,008.
[116] *See* RIA, *supra* note 3, at 17.

269. Because the Final Rule will result in a net decrease in families receiving federal housing assistance, and mixed status families are unlikely to be able to afford alternate housing, there is no basis for HUD's speculation that the number of mixed status families who become homeless will be lower than the number of fully eligible homeless families who receive housing assistance.

270. HUD claims that the availability of temporary deferral of termination of assistance is "intended to reduce displacement into homelessness."[117] Yet HUD acknowledges that it is unlikely that this temporary option will have its intended effects because many mixed status families will be deterred from seeking out deferral of termination and will instead self-evict.

271. HUD also discounts the burdens that displacing mixed status families will place on localities by asserting that "responsible entities are not required to identify or provide alternative housing placements" for mixed status families.[118] This assertion is similarly unsupported, as commenters explained. As social safety net providers, Plaintiff Localities—like localities all across the country—are required to address the health and safety needs of their residents.

272. HUD fails to adequately consider the negative effects of the Final Rule on the local supply of affordable housing and its deleterious impacts on housing authorities that operate public housing, private landlords who participate in federal housing assistance programs, and local governments that have invested significant resources in affordable housing projects, despite multiple comments presenting evidence to that effect.

[117] Final Rule, *supra* note 38, at 72,998.
[118] *Id.* at 73,005, 73,008.

273. For example, in the Final Rule, HUD dismisses extensive evidence of the likely impact of the rule on the availability of privately owned affordable housing units, but does not meaningfully grapple with the enormous disruption that terminating assistance for tens of thousands of families in a short window will have on private landlords' operations, the significant costs they will incur for evictions and turnovers, and the long delays in re-leasing units and the resulting lost revenue, *see* Part III.B, IV.A, *supra*—all of which are likely to reduce landlords' willingness to continue participating in affordable housing programs or their ability to remain financially solvent.[119]

274. HUD significantly understates the costs to local housing authorities and landlords. HUD estimates that only 5 percent of mixed status families would need to be formally evicted and assumes the rest will leave voluntarily. While a large number of mixed status families will undoubtedly self-evict out of fear of the Final Rule, as HUD predicts, the number who contest evictions is still likely to be higher than HUD estimates. For example, half of mixed status families live in states like California and New York that have strong tenant protection laws and policies limiting state and local assistance with immigration enforcement, and HUD acknowledges that families in such jurisdictions are more likely to contest evictions.[120] Indeed, many of the Plaintiff Localities that are home to large numbers of mixed status families similarly have strong tenant protection laws and local laws and policies that limit cooperation with immigration enforcement. The costs of eviction are therefore likely to be significantly higher than HUD estimates.

---

[119] *See id.* at 72,992.
[120] *See, e.g.,* Cal. Civ. Code § 1946.2(a); Cal. Gov't Code § 7284.6; N.Y. Real Prop. Acts. Law § 768; N.Y. Exec. Law § 170-K.

275. HUD underestimates the turnover costs for housing authorities and landlords. In the RIA, HUD only calculates turnover costs for units vacated by the 5 percent of families that HUD estimates will contest their evictions (approximately 990 families).[121] Yet HUD estimates that approximately 15,500 mixed status families will leave their subsidized units and lose assistance. Housing authorities and landlords will incur turnover costs for each of these units.

276. HUD significantly understates the cost of verification for local housing authorities to verify the eligibility of noncitizen senior applicants and tenants who have not contended eligibility. In the RIA, HUD estimated that only 1.05 percent of current tenants would likely need to submit documentation, yet commenters suggested that number was likely significantly higher. Moreover, HUD fails to account for the additional administrative burdens of requiring housing authorities to collect documentation for noncitizen seniors ages 62 and over and to run SAVE queries for U.S. citizen applicants and tenants.

277. HUD does not quantify impacts to housing authority revenues, including lost rent as units remain vacant and a reduction in administrative fees and revenues as a result of fewer households receiving assistance under the Final Rule.

278. HUD also ignores considerable evidence that while the SAVE system has historically been used to check a noncitizen's immigration status, it is not a reliable source of U.S. citizenship information. While HUD claims that it "cannot substantiate claims that SAVE itself has a high error rate when verifying" citizenship status, commenters highlighted significant error rates in the data sources underlying the SAVE system, including, for example, the fact that Social Security Administration records do not reliably contain information about whether someone is a U.S. citizen.[122]

[121] RIA, *supra* note 3, at 27.
[122] *See* Final Rule, *supra* note 38, at 72,987.

279. HUD fails to consider that the required verification consent form misstates the legal requirements under Section 404 of PRWORA and the operative HUD 2000 Interagency Notice.

280. As discussed above, *see* Part IV.A, *supra*, the verification consent form uses broader language than Section 404 or the 2000 Interagency Notice, and suggests that both housing authorities and landlords must "immediately" report anyone that they "determine" is unlawfully present in the United States. HUD does not explain its decision to apply this reporting obligation to private owners or explain how "immediately" housing authorities and private owners are required to notify DHS regarding a person's unlawful presence in the United States.

281. The predictable result of this unexplained and ambiguous change to the consent form will be to generate fear among low-income families and dissuade them from seeking housing assistance. The unauthorized imposition of such a reporting obligation is also likely to lead to confusion and heightened burdens on private landlords, who have never had to perform this reporting function. This in turn may dissuade landlords from participating in the HCV program and reduce the supply of affordable housing in Plaintiff Localities.

282. HUD also failed to adequately consider regulatory alternatives to the Final Rule.

283. HUD acknowledges in the RIA that there are regulatory alternatives that would achieve a similar objective. Each of these alternatives would still be contrary to Section 214 for the reasons stated above. *See* Part V.A, *supra*. Nonetheless, HUD provides no meaningful analysis of why either of these alternatives were rejected, particularly where they would result in significantly less displacement than the Final Rule.

284. First, HUD noted that it could continue to provide assistance for mixed status families with children, which "would mitigate the adverse effects of the rule on child

development" and "would also avoid a conflict with Executive Order 13045, 'Protection of Children from Environmental Health Risks and Safety Risks.'"[123]

285. Executive Order 13,045 directs agencies to "identify and assess environmental health risks and safety risks that may disproportionately affect children" and "ensure that its policies, programs, activities, and standards address" those disproportionate risks to children. It requires agencies that submit economically significant rules to the Office of Information and Regulatory Affairs to provide "(a) an evaluation of the environmental health or safety effects of the planned regulation on children; and (b) an explanation of why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives considered by the Agency." Housing insecurity and homelessness increase environmental health risks and safety risks to children.[124]

286. HUD does not explain why this option was rejected in either the RIA or the Final Rule, nor does the agency explain how the Final Rule complies with HUD's obligations under Executive Order 13,045.

287. Second, HUD also noted that it could grandfather existing mixed status families. As HUD acknowledged in the RIA, this "would fulfill the objectives of the rule and avoid the transition costs borne by mixed families, i.e., moving costs and the indirect costs associated with the housing insecurity of the mixed families whose housing assistance is terminated."[125] In the Final Rule, HUD claims that it rejected this alternative because it would delay transferring

---

[123] RIA, *supra* note 3, at 37 & n.61.
[124] As the Centers for Disease Control and Prevention (CDC) recognize, "[p]eople experiencing homelessness are at increased risk for infectious and non-infectious diseases" and "commonly face mental illness, alcohol and substance use disorder, diabetes, and heart and lung disease." Ctrs. for Disease Control & Prevention, *About Homelessness and Health* (Oct. 15, 2024), https://www.cdc.gov/homelessness-and-health/about/index.html.
[125] RIA, *supra* note 3, at 37.

assistance to fully eligible families. Yet HUD does not explain, and could not rationally justify, why accelerating the transfer of assistance outweighs the grave and myriad harms discussed above. That omission is especially telling where HUD acknowledges "that mixed families are a small (under one percent) and declining share of assisted families."[126]

### C. The Final Rule Was Issued Without Observing Required Legal Procedures

288. HUD's rulemaking process was procedurally defective because it failed to meaningfully consider or respond to significant comments, to conduct requisite analyses, or to comply with funding and consultation requirements.

289. HUD failed to consider or address significant issues raised by public comments, including, but not limited to, comments raising the statutory prohibition on requiring noncitizens 62 years and older from providing documentation; comments highlighting the lack of support for HUD's assertion that fully eligible families are more capable of taking advantage of federal housing assistance and that housing assistance creates negative incentives for undocumented immigrants; comments providing significant evidence that the SAVE system may not accurately determine citizenship status; and comments describing the many harms that the Final Rule will create for families, housing authorities, localities, and states.

290. Under Executive Order 12,866, "Regulatory Planning and Review," HUD is required to assess all costs and benefits of the Final Rule, consider all possible or feasible regulatory alternatives—including the alternative of not issuing the regulation—and choose an alternative that maximizes net benefits to, *inter alia*, public health, safety, distributive impacts, and equity.[127] Executive Order 13,563, "Improving Regulations and Regulatory Review," also

[126] *See* Final Rule, *supra* note 38, at 72,996.
[127] Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993).

requires that agencies quantify the costs and benefits, both qualitative and quantitative, of a proposed regulation wherever possible.[128]

291. As discussed above, HUD failed to comply with Executive Orders 12,866 and 13,563 because it failed to assess all of the costs and benefits of the rule or meaningfully consider the alternatives, and chose a course that does not maximize net benefits to, *inter alia*, public health, safety, distributive impacts, and equity. In particular, through the Final Rule, HUD has chosen an alternative that will likely reduce the number of households and eligible individuals receiving federal housing assistance, with negative concomitant effects to public health and safety, and will significantly burden housing authorities and localities.

292. As discussed above, under Executive Order 13,045, "Protection of Children from Environmental Health Risks and Safety Risks," HUD is also required to evaluate the environmental health or safety effects of the planned regulation on children and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives. HUD did not explain how the Final Rule, which HUD acknowledges will harm children in mixed status families, complies with Executive Order 13,045. Notably, HUD considered but rejected an alternative of maintaining assistance to mixed status families with children, which HUD stated "would . . . avoid a conflict with Executive Order 13045."[129]

293. Under Executive Order 13,132, an agency may not promulgate a regulation that imposes substantial direct compliance costs on state and local governments, and that is not required by statute, unless the agency meets consultation and funding requirements specified by the Executive Order.[130]

---

[128] Exec. Order No. 13,563, 76 Fed. Reg. 3821 (Jan. 21, 2011).
[129] RIA, *supra* note 3, at 37 & n.61.
[130] Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 10, 1999).

294. HUD asserts that the Final Rule will not have any federalism impacts or impose direct compliance costs on state or local entities. But in fact, the Final Rule directly regulates public housing authorities—which are public entities created pursuant to state and local laws—and imposes significant administrative and compliance costs on them. HUD has failed to comply with the funding or consultation requirements of Executive Order 13,132.

## CAUSES OF ACTION

### COUNT I

### Violation of the Administrative Procedure Act

### Contrary to Law/Excess of Statutory Authority

295. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

296. Under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

297. Under the Administrative Procedure Act, courts must also "set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

298. HUD is an "agency" under the APA, 5 U.S.C. § 551(1), and the Final Rule constitutes a final agency action subject to review under the APA.

299. Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

300. In matters of statutory interpretation, courts are required to exercise independent judgment rather than defer to administrative agencies' interpretations. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024).

301. The Final Rule is contrary to law and exceeds HUD's statutory authority under Section 214.

302. Section 214 requires that prorated federal housing assistance be made available to families so long as the eligibility of at least one family member is affirmatively established.

303. Section 214 does not permit HUD to require all members of a household to affirmatively establish eligibility for housing assistance or to withhold housing assistance from an eligible individual if other members of their family have not demonstrated eligibility.

304. Section 214 does not authorize HUD to require the use of the SAVE database to verify the citizenship of U.S. citizens and nationals.

305. Section 214 does not authorize HUD to require noncitizens 62 years or older from having their eligibility verified through the SAVE database.

306. Section 214 does not authorize HUD to require noncitizens 62 years or older to provide documentation beyond a signed declaration of eligibility and proof of age.

307. Section 214 does not authorize HUD to impose a continuing obligation on families to immediately notify and submit new evidence of citizenship or eligible immigration status if a family member's status changes during occupancy.

308. Section 214 does not authorize HUD's revisions to the appeals process in 24 C.F.R. § 5.514(e).

309. Section 404 of PRWORA does not authorize HUD to require private property owners to report individuals unlawfully present in the United States to DHS.

310. Section 404 of PRWORA does not authorize HUD to require public housing authorities or private property owners to report individuals unlawfully present in the United States to DHS on an immediate or continuous basis.

311. Executive Order 14,218 does not authorize HUD to promulgate regulations inconsistent with the statutory requirements of Section 214 or PRWORA.

312. The Final Rule is therefore not in accordance with law and “in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,” in violation of the APA. 5 U.S.C. § 706(2)(A), (C).

313. Defendants’ violation causes ongoing harm to Plaintiffs.

**COUNT II**

**Violation of the Administrative Procedure Act**

**Arbitrary & Capricious**

314. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

315. The APA provides that courts must “hold unlawful and set aside” agency action that is “arbitrary, capricious, [or] an abuse of discretion.” 5 U.S.C. § 706(2)(A).

316. HUD is an “agency” under the APA, 5 U.S.C. § 551(1), and the Final Rule constitutes a final agency action subject to review under the APA.

317. “An agency action qualifies as ‘arbitrary’ or ‘capricious’ if it is not ‘reasonable and reasonably explained.’” *Ohio v. Env’t Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore “ensure, among other things, that the agency has offered ‘a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.’” *Id.* (quoting *Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). “[A]n agency cannot simply ignore ‘an important aspect of the problem’” addressed by its action. *Id.* at 293.

318. Moreover, "[t]he change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567 (2025). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* at 544 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

319. The Final Rule is arbitrary and capricious because Defendants have failed to provide a reasoned explanation for their decision to require all members of a household to affirmatively establish eligibility for federal housing assistance or for adopting the additional verification and documentation requirements imposed by the Final Rule.

320. The Final Rule is arbitrary and capricious because Defendants have failed to provide a reasoned explanation for their decision to impose additional documentation and verification requirements for tenants, including U.S. citizens and nationals and noncitizen seniors 62 years and older.

321. The Final Rule is arbitrary and capricious because it departs from prior policy without considering the significant reliance interests of mixed status families, individuals who were eligible for housing assistance at admission but lack the documentation required by the Final Rule, housing authorities, private landlords, and local governments.

322. The Final Rule is arbitrary and capricious because it ignores important aspects of the problem, including the myriad negative effects of the Rule on mixed status families and vulnerable tenants, costs to housing authorities and localities, and harms to local affordable housing markets.

323. The Final Rule is therefore “arbitrary, capricious, [or] an abuse of discretion” in violation of the APA. 5 U.S.C. § 706(2)(A).

324. Defendants’ violation causes ongoing harm to Plaintiffs and their residents.

**COUNT III**

**Violation of the Administrative Procedure Act**

**Failure to Observe Required Procedures**

325. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

326. The APA provides that courts must “hold unlawful and set aside” agency action that is “without observance of procedure required by law.” 5 U.S.C. § 706(2)(D).

327. HUD is an “agency” under the APA, 5 U.S.C. § 551(1), and the Final Rule constitutes a final agency action subject to review under the APA.

328. In issuing the Final Rule, HUD failed to consider or address significant issues raised by public comments, as required by 5 U.S.C. § 553(c).

329. The Final Rule fails to conduct the regulatory review required by Executive Order 12,866 and Executive Order 13,563, including considering all feasible alternatives, quantifying costs and benefits, and selecting the alternative that maximizes net benefits.

330. The Final Rule fails to comply with Executive Order 13,045, which requires federal agencies to evaluate the environmental health or safety effects of the planned regulation on children and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives.

331. The Final Rule fails to comply with Executive Order 13,132, which prohibits federal agencies from promulgating rules that impose substantial direct compliance costs on state

and local governments unless the federal government provides funds necessary to pay for those costs or the federal agency has engaged in a consultation process outlined in the Executive Order.

332. The Final Rule imposes direct compliance costs on public housing authorities, which are governmental entities created pursuant to state and local laws.

333. HUD did not comply with the consultation requirements of Executive Order 13,132, nor has the federal government provided funds to cover the compliance costs of the Rule.

334. The Final Rule is therefore promulgated "without observance of procedure required by law" in violation of the APA. 5 U.S.C. § 706(2)(D).

335. Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1. Declare that the Final Rule is in excess of HUD's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

2. Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3. Declare that the Final Rule was promulgated without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D);

4. Vacate and set aside the Final Rule;

5. Postpone the effective date of the Final Rule pursuant to 5 U.S.C. § 705;

6. Preliminarily and permanently enjoin Defendants and all of their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule;

7. Preliminarily and permanently enjoin Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit;

8. Award Plaintiffs their reasonable attorneys' fees and costs; and

9. Grant other such relief as this Court may deem proper.

DATED: November 23, 2026

Respectfully submitted,

/s/ *David Chiu*

DAVID CHIU (CA Bar No. 189542)*
City Attorney
YVONNE R. MERÉ (CA Bar No. 173594)*
Chief Deputy City Attorney
MOLLIE M. LEE (CA Bar No. 251404)*
Chief of Strategic Advocacy
SARA J. EISENBERG (CA Bar No. 269303)*
Chief of Complex and Affirmative Litigation
JESSICA ALFARO-CASSELLA (CA Bar No. 306875)*
SOPHIA CAI (CA Bar No. 327773)*
KARUN TILAK (CA Bar No. 323939)*
Deputy City Attorneys
San Francisco City Attorney's Office
1390 Market Street, 7th Floor
San Francisco, CA 94102
Tel.: (415) 355-3308
jessie.cassella@sfcityatty.org
sophia.cai@sfcityatty.org
karun.tilak@sfcityatty.org

*Attorneys for Plaintiffs City & County of San Francisco and Housing Authority of the City & County of San Francisco*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

MICHAEL FIRESTONE
Corporation Counsel

/s/ *Samuel Dinning*
Samuel Dinning (BBO# 704304)
Chief of Staff & Policy
Katherine Aubuchon-Jones (BBO# 705490)
Senior Assistant Corporation Counsel
City of Boston Law Department
1 City Hall Plaza, Room 615
Boston, MA 02201
Tel.: 617-635-4034
samuel.dinning@boston.gov
katherine.jones@boston.gov

*Attorneys for Plaintiff City of Boston*

DATED: November 23, 2026

RENEE CAMILLE HATCHER
Acting Corporation Counsel of the City of Chicago

/s/ *Nathan Cummings*
Nathan Cummings (ARDC #6345560)*
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, IL 60602
Tel.: (312) 744-8311
nathan.cummings@cityofchicago.org

*Attorneys for Plaintiff City of Chicago*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles

/s/ *Michael J. Dundas*

Michael J. Dundas (CA Bar No. 226930)*
Adrienne S. Khorasanee (CA Bar No. 227704)*
Kristine A. Moon (CA Bar No. 217646)*
Joshua M. Templet (CA Bar No. 267098)*
Office of the Los Angeles City Attorney
200 North Main Street, Room 800
Los Angeles, CA 90012
Tel.: (213) 978-8100
mike.dundas@lacity.org
adrienne.khorasanee@lacity.org
kristine.moon@lacity.org
joshua.templet@lacity.org

*Attorney for Plaintiff City of Los Angeles*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

DAWYN R. HARRISON
County Counsel

/s/ *Michael S. Buennagel*

MICHAEL S. BUENNAGEL (CA Bar No. 259000)*
BRIGIT GREESON ALVAREZ (CA Bar No. 237301)*
ROBERT J. HILL (CA Bar No. 150112)*
Senior Deputy County Counsels
Office of the Los Angeles County Counsel
648 Kenneth Hahn Hall of Administration
500 W. Temple Street
Los Angeles, CA 90012-2713
Tel.: (213) 808-8736
mbuennagel@counsel.lacounty.gov
bgreesonalvarez@counsel.lacounty.gov
rhill@counsel.lacounty.gov

*Attorneys for Plaintiffs County of Los Angeles and Los Angeles County Development Authority*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

STEVEN BANKS
Corporation Counsel of the City of New York

/s/ *Kimberly B. Frumkin*
Melanie C.T. Ash*
Doris Bernhardt*
Kimberly B. Frumkin*
Assistant Corporation Counsels
100 Church Street
New York, NY 10007
Tel.: (212) 356-1000
mash@law.nyc.gov
dbernhar@law.nyc.gov
kfrumkin@law.nyc.gov

*Attorneys for Plaintiff the City of New York*

**pro hac vice motion forthcoming*

DATED: November 23, 2026

LEESA MANION (she/her)
King County Prosecuting Attorney

/s/ *Cristy J. Craig*
Cristy J. Craig*, WA Bar No. 27451
Senior Deputy Prosecuting Attorney
Christopher M. Sanders*, WA Bar No. 47518
General Counsel to the King County Executive
701 Fifth Avenue, Ste 600
Seattle, WA 98104
Tel.: (206) 477-1200
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov

*Attorneys for Plaintiff Martin Luther King Jr. County*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

/s/ *Jeffrey Dana*
Jeffrey Dana*
City Solicitor
City of Providence
444 Westminster Street
Providence, RI 02903
Tel.: (401) 680-5333
jdana@providenceri.gov

*Attorney for Plaintiff City of Providence*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

HEATHER FERBERT
San Diego City Attorney

/s/ *Julie Rau*
Julie Rau (BBO No. 696887)**
Lead Deputy City Attorney
1200 Third Avenue, Suite 1500
San Diego, CA 92101
Tel.: (619) 533-5800
JRau@sandiego.gov

*Attorneys for Plaintiff City of San Diego*

***Application for Admission to D. Mass. Pending*

DATED: November 23, 2026

OFFICE OF THE COUNTY COUNSEL, COUNTY OF SANTA CLARA

/s/ *Tony LoPresti*
Tony LoPresti*
*County Counsel*
Kavita Narayan*
*Chief Assistant County Counsel*
Meredith A. Johnson*
*Lead Deputy County Counsel*
Stefanie L. Wilson*
Valerie D. Comenencia Ortiz*
*Deputy County Counsels*
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
Tel.: (408) 299-9021
tony.lopresti@cco.sccgov.org
kavita.narayan@cco.sccgov.org
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
v.comenenciaortiz@cco.sccgov.org

*Attorneys for Plaintiff County of Santa Clara*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

ERIKA J. EVANS
Seattle City Attorney

/s/ *Yesica Hernandez*
Yesica Hernandez, WSBA# 48399 *
Ghazal Sharifi, WSBA# 47750*
Assistant City Attorneys
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Tel.: (206) 684-8200
Yesica.Hernandez@seattle.gov
Ghazal.Sharifi@seattle.gov

*Attorneys for Plaintiff City of Seattle*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

BOSTON HOUSING AUTHORITY
By its attorney:

/s/ *Constantine Papademetriou*

Constantine Papademetriou (BBO #551194)
General Counsel
Boston Housing Authority
52 Chauncy Street
Boston, MA 02111
Tel.: 617-988-4165
dean.papademetriou@bostonhousing.org

*Attorney for Boston Housing Authority*

DATED: November 23, 2026

/s/ *Craig W. Armstrong*

Craig W. Armstrong*
Rachel L. Alstrom*
BAKER MANOCK & JENSEN, PC
5260 North Palm Ave., Suite 201
Fresno, CA 93704
Tel: (559) 432-5400
carmstrong@bakermanock.com
ralstrom@bakermanock.com

*Attorneys for Housing Authority of the City of Fresno and Housing Authority of Fresno County*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

HOUSING AUTHORITY OF THE CITY OF LOS ANGELES

/s/ *Brian D. Lauter*

Brian D. Lauter (CA State Bar No. 267619)*
Legal Department
Housing Authority of the City of Los Angeles
2600 Wilshire Blvd, 3rd Floor
Los Angeles, CA 90057
Tel.: (213) 518-0838
brian.lauter@hacla.org

*Attorneys for Housing Authority of the City of Los Angeles*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

/s/ *Charles B. Christensen*
Charles B. Christensen, Esq.*
Walter F. Spath III, Esq.*
Christensen & Spath LLP
401 West A. Street, Ste. 2250
San Diego, CA 92101
Tel.: (619) 255-6587
cbc@candslaw.net
wfs@candslaw.net

*Attorneys for Plaintiff San Diego Housing Commission*

**pro hac vice* motion forthcoming

DATED: November 23, 2026

/s/ *Jivko F. Tchakarov*
Jivko F. Tchakarov, Esq.*
PRICE, POSTEL & PARMA LLP
200 E. Carrillo Street, Suite 400
Santa Barbara, CA 93101
Tel.: 805.962.0011
jtchakarov@ppplaw.com

*Attorney for Plaintiff Housing Authority of the City of Santa Barbara*

**pro hac vice* motion forthcoming